RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0154p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

TRI COUNTY WHOLESALE DISTRIBUTORS, INC.; THE
BELLAS COMPANY,

　　　　*Plaintiffs-Appellants/Cross-Appellees*,

　　　*v.*

LABATT USA OPERATING CO., LLC; CERVECERIA
COSTA RICA, S.A., NORTH AMERICAN BREWERIES
HOLDINGS, LLC,

　　　　*Defendants-Appellees/Cross-Appellants*.

Nos. 15-3710/3769

> Appeal from the United States District Court
> for the Southern District of Ohio at Columbus.
> No. 2:13-cv-00317—Algenon L. Marbley, District Judge.

Argued: March 17, 2016

Decided and Filed: July 6, 2016

Before: BOGGS, SILER, and BATCHELDER, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David W. Alexander, SQUIRE PATTON BOGGS (US) LLP, Columbus, Ohio, for Appellants/Cross-Appellees. James B. Niehaus, FRANTZ WARD LLP, Cleveland, Ohio, for Appellees/Cross-Appellants. **ON BRIEF:** David W. Alexander, Larry J. Obhof Jr., Christopher F. Haas, SQUIRE PATTON BOGGS (US) LLP, Columbus, Ohio, for Appellants/Cross-Appellees. James B. Niehaus, Christopher C. Koehler, FRANTZ WARD LLP, Cleveland, Ohio, for Appellees/Cross-Appellants.

1

———————————

**OPINION**

———————————

BOGGS, Circuit Judge.    After Prohibition ended in 1933 when the Twenty-First Amendment was ratified, most states adopted a system for distributing alcoholic beverages that consists of three tiers:  suppliers, distributors, and retailers.  Suppliers manufacture or import alcoholic beverages, and they must sell their products to state-licensed distributors.  Those distributors then sell the products to retailers, who sell them to consumers.  While many economists are skeptical about the public benefits of this regulatory scheme, Ohio continues to operate under a three-tier system.

One feature of Ohio's three-tier system is that when a supplier and a distributor enter into a franchise agreement, the agreement is protected from termination without just cause.  Ohio Rev. Code § 1333.85.  That protection, however, is subject to an exception for when "a successor manufacturer acquires all or substantially all of the stock or assets of another manufacturer through merger or acquisition."  *Id.* § 1333.85(D).  If such an acquisition occurs, the successor manufacturer may terminate the franchise if it repurchases the distributor's inventory of the products and "compensate[s] the distributor for the diminished value of the distributor's business that is directly related to the sale of the product or brand terminated or not renewed by the successor manufacturer."  *Ibid.*  In this case, we consider the scope of transactions covered by § 1333.85(D) and the proper method for calculating the diminished value of a distributor's business.  We also consider whether the Takings Clauses of the federal and Ohio constitutions protect distributors' franchises from termination under § 1333.85(D).

I

The plaintiffs in this case—Tri County Wholesale Distributors and Iron City Distributing ("the distributors")—are distributors of alcohol in Ohio that entered into franchise agreements with a supplier—Labatt USA Operating Co., LLC ("Labatt USA Operating").  The franchise agreements allowed the distributors to sell several prominent brands of beer in their respective territories:  Labatt, Genesee, Dundee, Honey Brown Lager, and Seagram's Escapes.

Labatt USA Operating is 100% owned and controlled by North American Breweries Holdings, LLC ("NAB Holdings") through a series of five intermediate nested holding companies:



North American Breweries Holdings, LLC

|      100% Ownership

North American Breweries Intermediate Holdings, LLC

|      100% Ownership

North American Breweries, Inc.

|      100% Ownership

NAB Holdco, LLC

|      100% Ownership

North American Breweries Operating Holdco, LLC

|      100% Ownership

Labatt USA Operating Holdings, LLC

|      100% Ownership

Labatt USA Operating Co., LLC

Before December 11, 2012, the membership interests in NAB Holdings were owned by several investors ("KPS entities"). On December 11, the KPS entities sold their interests in NAB Holdings through a complex transaction that resulted in CCR American Breweries, Inc. ("CCR") owning 100% of NAB Holdings. About three months later, on March 7, 2013, Tri County received a letter from CCR purporting to terminate Tri County's right to distribute the brands supplied by Labatt USA Operating. On March 11, 2013, Iron City received a similar letter. The letters claimed that CCR was entitled to terminate the franchise agreements because CCR's acquisition of NAB Holdings qualified under Ohio Revised Code § 1333.85(D) as a transaction in which "a successor manufacturer acquire[d] all or substantially all of the stock or assets of another manufacturer through merger or acquisition."

The distributors responded by suing Cerveceria Costa Rica, S.A. (the owner of CCR), Labatt USA Operating, and NAB Holdings ("the suppliers") for: (1) a declaratory judgment stating that the franchises cannot be terminated under § 1333.85(D) and an award of any damages resulting from the suppliers' attempted termination of the franchises; (2) in the alternative, a declaratory judgment stating that the suppliers may not terminate the franchises under § 1333.85(D) because doing so would violate the Takings Clauses of the federal and Ohio constitutions; or (3) in the alternative, if the suppliers may terminate the franchises under § 1333.85(D), the diminished value of the distributors' businesses.

The district court granted the suppliers judgment on the pleadings on the Takings Clause claim and summary judgment on the claim regarding the scope of § 1333.85(D). The court then held a bench trial to determine the diminished value of the distributors' businesses, the details of which will be discussed below. The court determined that the diminution of the values of Tri County and Iron City was $2,756,459 and $302,720, respectively.

The distributors now appeal the district court's rulings, raising four issues: (1) whether the suppliers were entitled to terminate the franchises under § 1333.85(D); (2) whether the terminations, if allowed under § 1333.85(D), violate the Takings Clauses of the federal and Ohio constitutions; (3) whether the district court should have included in the distributors' awards the net operating losses they were expected to incur after the termination of the franchises; and (4) whether the district court should have relied solely on the distributors' expert's proposed capital structure in calculating the diminished value of the distributors' businesses. The suppliers raise two additional issues in their cross-appeal: (1) whether the district court should have deducted profits earned by the distributors after the valuation date of the brands from the court's calculation of the diminished value of the distributors' businesses; and (2) whether the district court should have relied solely on the suppliers' expert's proposed capital structure in calculating the diminished value of the distributors' businesses.

II

The first issue is whether the suppliers were entitled to terminate their franchise agreements with the distributors under § 1333.85(D), a question of law that we review de novo.

*Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993). Under Ohio Revised Code § 1333.85, suppliers cannot terminate franchise agreements without just cause, but § 1333.85(D) provides an exception for when "a successor manufacturer acquires all or substantially all of the stock or assets of another manufacturer through merger or acquisition or acquires or is the assignee of a particular product or brand of alcoholic beverage from another manufacturer." The question here is whether § 1333.85(D) covers CCR's acquisition of NAB Holdings from the KPS entities.

The distributors argue that the suppliers are not entitled to terminate the franchise agreements because the statute requires "a successor manufacturer" to acquire the stock or assets of "another manufacturer." According to the distributors, when a supplier is owned by a parent company, which itself may be owned by several layers of parent companies, transfers of ownership at the upper levels do not trigger § 1333.85(D), because the upper-level companies are not "manufacturers." The distributors claim that only a company directly registered with Ohio's Division of Liquor Control can be a "manufacturer." Thus, the distributors contend that neither NAB Holdings nor CCR is a manufacturer; only Labatt USA Operating is a manufacturer.

The district court rejected the distributors' argument because a strict reading of the word "manufacturer" as excluding parent companies would lead to a conclusion "that is illogical and could not have been the intent of the drafters," quoting *Esber Beverage Co. v. Labatt USA Operating Co.*, Nos. 2011CA00113, 2011CA00116, 2012 WL 983171, at *6 (Ohio Ct. App. Mar. 12, 2012), *aff'd*, 3 N.E.3d 1173 (Ohio 2013). In that case, the Ohio Court of Appeals considered Labatt USA Operating's acquisition of the Labatt brands from InBev, and its subsequent attempt to terminate a franchise agreement that gave Esber the right to distribute the brands in ten Ohio counties. *Id.* at *1–2. Esber argued that "because Labatt USA Operating Co. was created for the purpose of supplying the Labatt brands and it was not supplying anything to anyone until it acquired the Labatt brands . . . Labatt USA Operating Co. was not a 'successor manufacturer' at the time it acquired the Labatt brands." *Id.* at *6. The court disagreed with Esber's reading of § 1333.85(D), writing:

> While we acknowledge that a strict reading of the statutory language leads to the position argued by appellee [Esber], we find such a strict reading of the definition of "manufacturer" also leads to a conclusion that is illogical and could not have been the intent of the drafters. We do not find that the statutes intended to treat a

business's right to terminate a franchise differently based on whether the business was created for the purpose of supplying a brand of alcohol to distributors or whether the business which acquired the brand was an existing supplier. In either situation, the entity [acquiring the brands] would be faced with making business decisions on how to operate most efficiently.

. . . .

. . . [I]n the instant case, it is clear that there was a transfer of ownership and control of the Labatt brands from InBev to Labatt USA Operating Co., effective March 13, 2009. There is no evidence that InBev and Labatt USA Operating Co. are under common control. . . . [T]he evidence is undisputed that there was in fact a complete sale of all assets related to the Labatt brands. The trial court therefore erred in finding that Labatt USA Operating was not a successor manufacturer within the meaning of R.C. 1333.85(D).

*Id.* at *6–7. Thus, even though Labatt USA Operating in that case did not sell any alcohol at the time it acquired the brands, it was a "successor manufacturer" because it received complete ownership and control of the brands from InBev.

*Esber* rejected a strict reading of "manufacturer" that is similar to the one proposed by the distributors in this case. Hence, the district court rejected the distributors' argument:

[T]he *Esber* Court determined that the dispositive inquiry in determining whether an entity was a "manufacturer" within the meaning of "successor manufacturer" was whether it was in the business of manufacturing or supplying alcoholic products or brands, and thus would be faced with making business decisions regarding how to operate most efficiently in the sale of products or brands.

. . . [T]estimony confirms that in addition CCR's complete acquisition of Labatt USA Operating, it also is tasked with making ultimate business decisions concerning the operations of Labatt USA Operating. Thus, it is a "manufacturer" within the meaning of the term "successor manufacturer."

We agree with the district court's application of *Esber*. Such a functional, control-based approach has been used consistently by courts in significant cases involving the applicability of § 1333.85(D). In *Superior Beverage Co. v. Schieffelin & Co.*, Möet-Hennessy's wholly owned subsidiary, Schieffelin Partner, was a 50% partner in S & S, which had the distributorship rights to the Möet-Hennessy brands. Nos. 1:05 CV 0834, 4:05 CV 0868, 2007 WL 2756912, at *1–2 (N.D. Ohio Sept. 20, 2007). S & S then transferred those distributorship rights to Schieffelin & Co., which was 100% owned by Möet-Hennessy. *Id.* at *3–4. In effect, Möet-Hennessy went

from having 50% control over business decisions relating to the brands to having 100% control. Because there was "another separately owned player" that controlled S & S before the transfer of the brands, *id.* at *10, the transaction was not one in which an "intra-corporate restructuring took place entirely within the same corporate family," and the court held that Schieffelin & Co. was "a successor manufacturer under the Act as a matter of law," *id.* at *11.

*Schieffelin* is not identical to this case, as *Schieffelin* did not involve a transfer of ownership at the parent-company level. Unlike CCR, Schieffelin & Co. itself "obtained a license from the State of Ohio to distribute the brands" that it acquired from S & S. *Ibid.* But *Schieffelin* did hold that the applicability of § 1333.85(D) turns on whether there has been a change in control of the business decisions regarding the brands. In *Schieffelin*, a change from 50% ownership to 100% ownership was enough to trigger § 1333.85(D). Here, there was a 100% change in ownership, with a complete change in control of the business decisions relating to the brands. This is not a situation in which the right hand sells to the left hand. Under a functional, control-based analysis, § 1333.85(D) applies.

There have also been state and federal cases using a control-based inquiry to conclude that § 1333.85(D) did not apply. In *Hill Distributing Co. v. St. Killian Importing Co.*, No. 2:11–CV–706, 2011 WL 3957255 (S.D. Ohio Sept. 7, 2011), a Danish company, Carlsberg, allowed Beverage Alliance to import its beer brands into the United States. *Id.* at *1. St. Killian subsequently acquired the importation rights from Beverage Alliance, *id.*, while Carlsberg continued to own and market the brands, *id.* at *3. In deciding whether St. Killian could terminate Carlsberg's franchise agreement with the plaintiff, Hill Distributing, the district court applied a functional, control-based test:

> Effectively, what has occurred is a restructuring of Carlsberg's business. It maintains control of its Brands, but those brands now have a different importer into the United States. Carlsberg continues to brew the beers, own the intellectual property, and approve the marketing campaigns. Additionally, it may terminate St. Killian under various circumstances and obtain a new importer. In essence, this is a restructuring of Carlsberg's importation arrangement, although its ownership and control of the Brands has never wavered.

*Ibid.* Because Carlsberg controlled the brands before and after the transaction, it was the sole "manufacturer." Therefore, the transaction was not an acquisition by a "successor manufacturer" covered by § 1333.85(D). In *Belvino L.L.C. v. Empson (USA) Inc.*, No. 97305, 2012 WL 2580758 (Ohio Ct. App. July 5, 2012), the Ohio Court of Appeals quoted *St. Killian* for the proposition that § 1333.85(D) applies only "when there is a change in ownership and control of brands through an arms-length merger or acquisition," *id.* at *7, and reached the same conclusion in a case with similar facts:

> In the instant case, when Empson took over as il Molino's exclusive importer in February 2010, Empson did not acquire any ownership rights in il Molino. The record demonstrates that il Molino continues to maintain control over its brands and can terminate its relationship with Empson at any time.
> il Molino's reasoning for the change was that it was effectively reorganizing its business structure. Because the wine remains under the ownership and control of il Molino, Empson does not qualify as a "successor manufacturer" under R.C. 1333.85(D). . . . .

*Ibid.*; *cf. Esber Beverage Co. v. Heineken USA, Inc.*, No. 2011CA33, 2011 WL 5626592, at *2, *5 (Ohio Ct. App. Nov. 14, 2011) (upholding trial court decision that § 1333.85(D) did not apply because "the transfer of import rights in the Brand . . . was merely a transfer from one Heineken controlled entity, NFB, to another Heineken controlled entity, HUSA").

Following in the footsteps of these earlier cases, the district court in this case applied a control-based test. It concluded that because CCR exercised its newly acquired control over the business decisions of Labatt USA Operating after acquiring NAB Holdings from the KPS entities, it was a "successor manufacturer," and could terminate the franchises under § 1333.85(D). Such a functional approach is in line with Ohio case law and provides a sensible reading of the statute, in contrast to the distributors' hyperliteral approach, which excludes all transactions at the parent-company level.

The distributors' counsel suggested at oral argument that this approach would undermine the statute's protectionist purposes and result in an "accelerated and immediate consolidation of the industry." As an initial matter, we see no reason to read § 1333.85(D) as having a protectionist purpose because that provision is clearly designed to provide successor manufacturers with the flexibility to "assemble their own team of distributors so long as the

successor manufacturers provide timely notice and compensate those distributors who are not being retained." *Esber Beverage Co. v. Labatt USA Operating Co.*, 3 N.E.3d 1173, 1174 (Ohio 2013).

Furthermore, even under the distributors' interpretation of the statute, CCR could still have terminated the franchises if it had only structured the transaction differently. Instead of acquiring NAB Holdings, CCR could simply have set up a new entity, which would then take control of the brands directly from Labatt USA Operating. As we have already discussed, this sort of transaction would clearly trigger § 1333.85(D) under *Esber*, 2012 WL 983171, at *6. Therefore, the distributors' interpretation of § 1333.85(D) would do little to stop any consolidation that allegedly might occur if successor manufacturers were allowed to terminate franchise agreements. The distributors' policy-based arguments are unpersuasive. We agree with the district court's interpretation of § 1333.85(D) and hold that the suppliers were entitled to terminate the franchise agreements.

## III

The distributors argue in the alternative that, if the suppliers are allowed to terminate their franchises under § 1333.85(D), such a termination would amount to an unconstitutional governmental taking for private purposes under the federal and Ohio constitutions. The district court rejected the distributors' argument and granted the suppliers judgment on the pleadings, a decision that we review de novo. *Lavado*, 992 F.2d at 605. Before diving into the doctrinal thicket, it is worth pausing for a moment to consider the bigger picture.

The distributors are the beneficiaries of an anticompetitive statute that deprives suppliers of their freedom to terminate contracts with distributors. *Cf.* Letter from C. Steven Baker, Director, Chicago Regional Office, Federal Trade Commission, to Illinois Senator Dan Cronin (Mar. 31, 1999) ("[A similar statute in Illinois] would shield the business of liquor distribution from market forces. . . . The likely result of such a static distribution system will be increased consumer prices. . . . We are unaware of any evidence establishing the need for this type of legislation."). Under § 1333.85, suppliers may not "cancel or fail to renew a franchise or substantially change a sales area or territory without the prior consent of the other party for other

than just cause." Any provision of a franchise agreement that waives or fails to comply with this requirement "is void and unenforceable." § 1333.83.

The provision involved in this case, § 1333.85(D), provides an exception to this anticompetitive scheme when "a successor manufacturer acquires all or substantially all of the stock or assets of another manufacturer through merger or acquisition." In that case, the supplier may end the franchise by repurchasing the distributor's inventory of the product or brand and "compensat[ing] the distributor for the diminished value of the distributor's business that is directly related to the sale of the product or brand terminated or not renewed by the successor manufacturer." The distributors' argument, in essence, is that the Takings Clauses of the federal and Ohio constitutions require Ohio to grant them the anticompetitive benefits of § 1333.85 without the exception provided by § 1333.85(D).

While that is the essence of the distributors' argument, they frame their case a little differently. The distributors claim that their franchises are property that has been taken for a solely private purpose in violation of the federal and Ohio constitutions. That argument fails because, even if we assume that their franchises are property, the Takings Clauses of the federal and Ohio constitutions deal with *government* takings of property. *See Armstrong v. United States*, 364 U.S. 40, 49 (1960) ("The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."). In this case, the suppliers are private actors who were not exercising the power of eminent domain under a delegation of authority from the government. *Cf. Nat'l R.R. Passenger Corp. v. Two Parcels of Land*, 822 F.2d 1261, 1265 (2d Cir. 1987) (discussing a statute that allowed Amtrak to exercise the "delegated power of eminent domain").

The distributors try to tie the suppliers' termination of the franchises to the government by arguing that the termination was sanctioned by the state under § 1333.85(D). That argument is incorrect. At common law, businesses have the freedom to enter into a contract that allows for termination, and contracting parties also have an inherent right to breach a contract that is no longer advantageous, committing what economists call an efficient breach. That common-law

norm is abrogated by § 1333.85, with an exception for situations falling under § 1333.85(D).  To the extent that the distributors have a right to protection from termination, it is a statutory right created by the state, which the state is free to take away.  *Cf. Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis*, 572 F.3d 502, 509 (8th Cir. 2009) (holding that there is no property interest in taxi licenses because the benefits of participating in a "highly regulated" market are subject to a "general expectation of regulatory change").  The distributors' claims under the federal and Ohio constitutions fail, and the district court correctly granted the suppliers judgment on the pleadings.

IV

We now consider the proper method for calculating the diminished value of a distributor's business under § 1333.85(D).  Both parties argue that the district court erred in its calculation.  We review the district court's rulings on questions of law de novo and questions of fact for clear error.  *See Max Trucking, LLC v. Liberty Mut. Ins. Corp.*, 802 F.3d 793, 803 (6th Cir. 2015).  Mixed questions of law and fact are reviewed de novo.  *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc).

The parties identify three issues pertaining to the district court's calculation of the diminished value of the distributors' businesses:  (1) whether the court's calculation should have included the value of the distributors' assets that were projected to be depleted during the time they attempted to acquire replacement brands to distribute; (2) whether the district court miscalculated the discount rate used to determine the value of the brands by averaging the capital structures put forth by the two parties' experts; and (3) whether the district court should have subtracted from the award the profits that the distributors derived from continuing to distribute the brands after the date of valuation.

A

The distributors argue that the district court miscalculated the diminished value of their businesses because it failed to include the cash they were projected to lose in net operating losses while attempting to acquire replacement products.  They claim to be entitled to those costs *in addition* to the fair market value of the lost brands.  The district court declined to award these

costs on the basis that they were already included in the court's calculation of the lost brands' fair market value. The suppliers agree, arguing that the distributors are essentially asking for a double recovery on a portion of their lost profits.

The distributors present no persuasive rebuttal to the double-recovery argument. They first point to the testimony of witnesses asserting that the depletion of their assets is a separate and independent loss from the value of the lost brands. But witness testimony cannot resolve the legal question of what constitutes "the diminished value of the distributor's business that is directly related to the sale of the product or brand terminated or not renewed by the successor manufacturer." Ohio Rev. Code § 1333.85(D).

The distributors' second argument is that:

> [S]everal times throughout its decision, the District Court unambiguously stated that the DCF valuation which formed the basis for its diminished value award was *not* actually an award of Distributors' projected profits on the NAB Brands. Rather the court used those projected profits as a tool to calculate the value of NAB Brands as a distinct, intangible asset.

The problem with this argument is that the only reason the distributors would be having net operating losses after losing the brands is that they are no longer able to earn profits from them. But when the district court awarded the distributors the value of the lost brands, they received a sum of money equal to the discounted present-day value of the projected future profits from those brands. The district court's award therefore compensates the distributors wholly for the "diminished value" of their companies. Perhaps if the district court's calculation of the value of the brands did not include lost profits, the distributors would have a point. But here, the projected profits were included in the district court's calculation. As the district court reasoned:

> [T]he values of the terminated franchises are equal to an estimate of lost profits the Distributors would have reaped from such contracts for some reasonable time into the future. This number should, theoretically, fully compensate the Distributors for the diminished value of their businesses, and put them in the place they would have been, from a profit perspective, but for the termination of the contracts. . . . It is for this reason that this Court declines to add onto the value of the lost franchise contracts any depletion of assets . . . . Such theoretical losses are better viewed as lost profits, for which Distributors will be compensated fully through a DCF accounting of the Brands' values.

The district court was correct to deny the distributors additional money equal to their projected net operating losses.

B

Both parties argue that the district court used the wrong capital structure in calculating the discount rate used to determine the diminished value of the distributors' businesses—that is to say, the value of the lost brands. To calculate the value of the lost brands in this case, the experts of both parties used discounted-cash-flow analysis. That procedure measures the present-day value of an asset based on the income it is expected to generate in the future, discounted to present-day value. Discounting allows for the final valuation to take into account the time value of money (money today is worth more than money tomorrow) and the uncertainty that exists about whether the projected future cash flow will actually materialize.

The formula used by the district court to calculate the discount rate requires the input of a capital structure. The parties dispute whether the appropriate capital structure should be that of a typical buyer or that of the entire industry over the long term. The distributors ask us to use the capital structure of a typical buyer, which their expert Lamont Seckman testified was 35% equity and 65% debt. The suppliers ask us to use the long-term industry capital structure, which their expert Samuel Kursh testified was 93.2% equity and 6.8% debt. The district court below averaged the two experts' figures in order to arrive at a capital structure of 64.1% equity and 35.9% debt.

Upon reviewing the parties' briefs, we conclude that their arguments raise issues of fact, not law. This court reviews factual questions for clear error, and we must affirm the district court's decision unless it leaves us with a "definite and firm conviction that a mistake has been committed." *Max Trucking*, 802 F.3d at 808.

The distributors raise two arguments for why the district court erred in relying in part on Dr. Kursh's long-term industry capital structure. First, they argue that Dr. Kursh "conceded that the usual valuation methodology does not consider the capital structure of the seller." But that testimony from Dr. Kursh must be read in context. The distributors' counsel asked Dr. Kursh whether it is typical to consider the seller's capital structure in determining the discount rate

under "the classical definition of discount rate . . . [which is] the rate necessary to attract . . . the buyer." Dr. Kursh acknowledged that, in determining the rate necessary to attract a buyer, the seller's capital structure was not relevant. However, Dr. Kursh also testified that he did not use that approach to calculating the discount rate for a reason: "In the diminished value scenario, because you're valuing the brands . . . in the place that they reside, you would look at the seller." Thus, contrary to the distributors' characterization, Dr. Kursh did not testify that his own methodology was unsuitable for the task at hand. Rather, he acknowledged that the distributors' counsel accurately described a different methodology, but disputed whether that methodology was applicable to this case.

Second, the distributors argue that Dr. Kursh "conceded that there is actually no reported 'industry average' capital structure, and that he calculated his figures using many assumptions for which there is no evidence in the record, and applying a methodology that has never been published or peer-reviewed." Dr. Kursh did acknowledge that his calculation of the long-term industry capital structure required him to "interpre[t] the data" and "make some assumptions." But as the district court noted, "[n]either expert presented the Court with foundational data or evidence showing how they arrived at their respective capital structures," and "both witnesses are qualified to produce estimations of the average capital structure used in the beer distribution industry." The few excerpts from Dr. Kursh's testimony cited by the distributors are hardly sufficient for us to conclude that the court committed clear error when it relied on Dr. Kursh's long-term industry capital structure.

The suppliers argue in their cross-appeal that the district court erred equally in relying in part on the capital structure put forth by Seckman. Their primary criticism of Seckman's capital structure is that it focuses on the typical buyer's capital structure, when "the method of financing a purchase is irrelevant to the value of the asset being purchased." The suppliers provide no citation to the record to support this assertion. Furthermore, the suppliers seem to contradict this argument in their reply brief:

> Appellants incorrectly state that Dr. Kursh's long term industry capital structure
> was based on the seller's capital structure. . . . The district court chose to use . . .
> the long term industry average [which was] based on NWBA data for all market
> participants – it was not limited to either buyers or sellers. Dr. Kursh's testimony,

therefore, was the only reliable evidence on which the District Court could rely to calculate the WACC.

By arguing in their reply brief in favor of considering both buyers' and sellers' capital structures, the suppliers undercut their initial argument against considering the typical buyer's capital structures. To avoid this problem, the suppliers try to shift their argument in their reply brief by emphasizing that the district court contradicted itself when it relied on Seckman's buyer-focused capital structure while simultaneously finding that "the appropriate discount rate is one that uses the average industry capital structure." We decline to consider this argument because the "general rule is that appellants cannot raise a new issue for the first time in their reply briefs." *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 820 F.2d 186 (6th Cir. 1987) (quoting *Thompson v. C.I.R.*, 631 F.2d 642, 649 (9th Cir. 1980)).

The parties' factual arguments essentially relitigate the "battle of the experts" that occurred at the trial court. After reviewing their arguments and the record, we are not left with a definite and firm conviction that a mistake has been committed. We affirm the district court's calculation of the discount rate.

C

The suppliers argue in their cross-appeal that the district court should have subtracted post-valuation-date profits from its calculation of the diminished value of the distributors' businesses. While this litigation was pending in the district court, the suppliers were not allowed to transfer the brands in question to new distributors. Furthermore, after the court held the terminations valid and calculated the value of the brands, it granted the distributors' motion for a stay pending appeal, which again prevented the transfer of the brands. The distributors have therefore been allowed to reap profits from the brands throughout the course of this litigation. The suppliers claim that these profits should be deducted from the court's calculation of the diminished value of the distributors' businesses, because that calculation already includes projected future profits. They argue that allowing the distributors to keep the profits they earned would result in the distributors receiving a windfall.

As an initial matter, we address two arguments by the distributors that we find to be unpersuasive. First, the distributors argue that the suppliers' position is at odds with their prior argument at the preliminary-injunction stage, during which they argued that a preliminary injunction was unnecessary because:

> [T]he termination cannot effectively take place until [the suppliers] have compensated the Distributors for the diminished value of their businesses caused by the termination. . . . [A]bsent further order of this Court, the Distributors will be able to continue distributing Labatt Brands and Genesee Brands without interruption. In short, the Distributors face no harm that is either actual or imminent.

This passage does show that the suppliers previously said that the distributors could continue to distribute the brands while the litigation was pending. But that position is not inconsistent with the suppliers' claim in this case. The suppliers were simply stating the distributors could continue to distribute the brands until the court ruled on whether the termination was valid, and if the distributors happened to win the case, they could keep the profits. The above-quoted passage says nothing about whether the distributors would get to keep the profits if they lost the case.

The distributors also argue that the suppliers forfeited their argument about post-valuation-date profits because they did not appeal the district court's ruling on their motion for an order allowing them to transfer the brands to a new distributor under § 1333.851. The district court denied that motion because the procedures set forth in § 1333.851 are only available when it is clear that § 1333.85(D) applies, and in this case, the key question is whether § 1333.85(D) applies. The distributors claim that the suppliers' failure to appeal this decision by the district court constitutes a forfeiture of their argument for deducting post-valuation-date profits. That argument fails for the simple reason that this appeal concerns the proper method for calculating the "diminished value" of the distributors' businesses under § 1333.85(D), which has nothing to do with the procedures set forth in § 1333.851.

Having dispensed with these two arguments, we now turn to the district court's analysis. The district court gave several reasons for why it rejected the suppliers' argument for deducting post-valuation-date profits. First, the court noted that nothing in the statute specifically calls for a deduction of post-valuation-date profits. But it is unsurprising that no such provision exists,

because if a supplier successfully uses the statute to terminate a franchise agreement, the distributor would obviously be unable to earn additional profits after the termination. The absence of such an express provision does not definitively answer the question raised by the suppliers, which is whether refusing to deduct post-valuation-date profits is consistent with the court's obligation to calculate the "diminished value" of the distributors' businesses under § 1333.85(D). The suppliers argue that when the termination is delayed beyond the rightful date of termination, which in this case corresponds with the valuation date, profits earned during that delay cannot be a part of the "diminished" value of the distributors' businesses.

The court's second reason for rejecting the suppliers' argument was that "[a]lthough the DCF method [of calculating the franchises' present-day value] is based conceptually on future cash flows, it is not, in actuality, merely a representation of future cash flows, but is, instead, an estimate of the total value of the intangible asset." This position is at odds with the district court's earlier holding regarding the distributors' net-operating-loss argument, which was premised on the fact that the experts' calculations of the franchises' present-day value *already included* projected future profits. If that is so, then awarding the distributors the present-day value of the franchises *in addition* to letting them keep post-valuation-date profits would give them a windfall. The distributors would be profiting from the brands for several years beyond the date on which the franchise agreements should have been terminated, and such profits are already included in the experts' calculations of the "diminished value" of the distributors' businesses.

To be more specific, the suppliers attempted to terminate the franchise agreements on March 7, 2013. As of the date of this decision, it has been over three years since the suppliers should have been able to terminate the agreements. The special masters' calculations show that the first three years of projected profits after discounting make up $976,834 of the $2,757,459 awarded to Tri County and $106,891 of the $302,720 awarded to Iron City—roughly 35% of the total awards. If we did not account for the profits earned by the distributors during the pendency of this litigation, the distributors would receive a major windfall through this litigation that delayed the suppliers' lawful exercise of their termination rights.

The court's third reason for rejecting the suppliers' position was that the suppliers themselves made a profit from their transactions with the distributors. The court reasoned: "By Defendants' argument, if Plaintiffs are to disgorge their profits, so should Defendants for the same period. What is more apparent is that both parties have benefitted financially from the status quo and such post-termination benefits should not enter into this Court's calculus." However, the suppliers' profits are not relevant to the inquiry prescribed by the statute, § 1333.85(D), which states that the supplier must "compensate the distributor for the diminished value of the distributor's business." The statute's language focuses on the distributors' losses and says nothing about the suppliers' profits. Therefore, granting the distributors an award that reflects lost future profits from the terminated franchises while also allowing them to earn profits from those franchises for several years gives them more than they are entitled to under the statute. Furthermore, it is not entirely fair to say that the suppliers benefited from the status quo. There is no evidence that the suppliers' profits from the brands distributed by the plaintiffs were meaningfully superior to the profits that they would have earned from their desired distributors. While they may have made some profits from their transactions with the distributors, they were harmed, perhaps even more, by their inability to negotiate new franchise agreements with new distributors that may have been more profitable.

The court's final reason for rejecting the suppliers' argument for post-valuation-date profits was that it "sensed hypocrisy" in the suppliers' argument, because:

> On the one hand, they stand firmly by the principle that this Court must assess the value of the NAB Brands as of the date of termination. As such, this Court is prohibited from considering post-termination conditions or events. On the other hand, by their demand to deduct post-termination benefits, Defendants ask this Court to look to post-termination events. Further, rather than estimating post-termination profits based on the conditions of the businesses as of March 2013—which is the date from which Defendants determine diminished value—Defendants ask this Court to deduct actual profits from March 13 through January 2015. This inconsistency, too, goes against deducting post-termination benefits.

This analysis would be fair if the suppliers had actually terminated the franchise agreements on March 7, 2013, and been allowed to negotiate new agreements while this litigation was pending. But given that the distributors have been allowed to retain the brands for over three years beyond

the termination date, letting them keep the profits derived from those brands while also awarding them a sum of money that includes projected profits for that time period would give them more than the "diminished value" of their businesses.

The district court raised an important point in criticizing the suppliers' proposed deduction of actual profits rather than projected profits. The projected profits used in calculating the diminished value of the distributors' businesses were discounted substantially in order to arrive at their value in 2013. Subtracting the actual profits earned by the distributors in 2014, 2015, and 2016 without discounting them would be unfair to the distributors. We agree with the district court that it would be improper to deduct actual profits. Therefore, we instead hold that the profits that the distributors were projected to earn during the period of time leading up to the final resolution of this litigation—that is to say, the date when the franchise agreements are actually terminated—must be deducted from their award.

V

We REVERSE the district court's calculation of the diminished value of the distributors' businesses and REMAND with instructions to deduct the profits projected to be earned by the distributors during the period of time leading up to the date when the franchise agreements are finally terminated. We AFFIRM the remainder of the district court's decision.