NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0539n.06

Case No. 23-3283

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Dec 27, 2023
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| CAVALIER DISTRIBUTING COMPANY, INC., | ) ) ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE SOUTHERN DISTRICT OF |
| | ) | OHIO |
| LIME VENTURES, INC., | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

Before: WHITE, THAPAR, and BLOOMEKATZ, Circuit Judges.

THAPAR, Circuit Judge. For fifteen years, Cavalier Distributing Company distributed beer produced by two Belgian microbreweries. But when the breweries' importer went bankrupt, Cavalier stopped receiving the breweries' beer. The breweries selected a new importer, Lime Ventures, which declined to sell beer to Cavalier and entered into a distribution agreement with a competitor. Cavalier requested a preliminary injunction halting that agreement, but the district court denied it. We affirm.

I.

Cavalier Distributing Company is an alcoholic beverage distributor in Ohio. For fifteen years, it distributed lambics, a type of sour beer, produced by two Belgian microbreweries. Shelton Brothers, an internationally renowned importer, had an agreement with the breweries in which it

would purchase their beer, acquire the rights to use the brands, import the beer to the United States, and market the products.

Most Americans weren't familiar with the breweries' beer when Shelton Brothers began importing it. So Shelton Brothers promoted the beer on radio shows, at festivals, and on the internet. It also designed product labels. And Shelton Brothers selected the distributors that would sell the beer to retailers in each state. Shelton Brothers entered into an exclusive distribution contract with Cavalier, in which Cavalier had sole rights to distribute the breweries' product in Ohio. Shelton Brothers also entered into other such agreements with distributors in other states.

Shelton Brothers made these marketing and distribution decisions without the breweries' input or oversight. Indeed, the breweries' beers were typically marketed as "Shelton Brothers brands," including on Cavalier's own website.

Things soured when Shelton Brothers filed for bankruptcy. Lime Ventures bought Shelton Brothers' remaining lambic inventory, established relationships with the breweries, obtained the rights to sell and market the beer in the United States, and became the breweries' new U.S. importer. Lime Ventures proposed a distribution agreement, but after Cavalier suggested edits to the proposed agreement, Lime refused to negotiate further and opted for a different Ohio distributor.

Cavalier sued, claiming Lime Ventures violated Ohio law. Specifically, Cavalier argued that Lime Ventures terminated Cavalier's franchise with the breweries in violation of the Ohio Alcoholic Beverage Franchise Act.[1] As part of this suit, Cavalier sought a preliminary injunction

---

[1] Cavalier also sued Lime Ventures for tortious interference, but Cavalier doesn't discuss this claim on appeal.

Case No. 23-3283, *Cavalier Distrib. Co. v. Lime Ventures, Inc.*

barring Lime Ventures from selling the beer to other distributors in Ohio.[2]  The district court denied the motion, finding Cavalier was unlikely to prevail on the merits.  *Cavalier Distrib. Co. v. Lime Ventures, Inc.*, No. 22-CV-121 (DRC), 2023 WL 2384440, at *2, *7 (S.D. Ohio Mar. 7, 2023).  Cavalier now appeals.

II.

A preliminary injunction is an "extraordinary remedy."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  Courts may issue one only if a plaintiff shows that (1) it's likely to prevail on the merits, (2) it faces irreparable harm, (3) the balance of equities favors the plaintiff, and (4) the public interest supports an injunction.  *Id.* at 20.  The district court concluded Cavalier failed to make this showing, and we agree.

First, Cavalier hasn't shown a likelihood of success on the merits.  The Ohio Alcoholic Beverage Franchise Act governs relationships between Ohio distributors and their suppliers.  *See* Ohio Rev. Code Ann. §§ 1333.82–87.  The Act refers to suppliers as "manufacturers," even if they don't actually manufacture beer.  *Id.* § 1333.82.  In other words, an entity qualifies as a "manufacturer" under the Act if it "manufactures *or* supplies alcoholic beverages to distributors in [Ohio]." *Id.* (emphasis added).

When manufacturers enter into agreements with distributors like Cavalier, it's called a "franchise."  *Id.*  Ideally, these franchises take the form of written contracts.  *Id.* § 1333.83.  But implied franchises also arise when a party distributes beer "for a manufacturer" for at least ninety days.  *Id.*  The Franchise Act imposes numerous restrictions on manufacturers.  *See id.* §§ 1333.84–

---

[2] Cavalier also attempted to enjoin the breweries, but Cavalier was unable to serve them.  *Distrib. Co. v. Lime Ventures, Inc.*, No. 22-CV-121 (DRC), 2023 WL 2384440, at *2 (S.D. Ohio Mar. 7, 2023).  As a result, the district court denied the motion insofar as it asked for the court to exercise its jurisdiction over the breweries.  *Id.*  Cavalier does not appeal that ruling here.

85. Most importantly, manufacturers may not unilaterally terminate a franchise without cause. *Id.* § 1333.85.

Here, the parties dispute whether Lime Ventures violated the Franchise Act. The parties agree that the answer depends on Cavalier's relationship with Shelton Brothers. But they disagree over which party was the "manufacturer" subject to Cavalier's franchise: Shelton Brothers or the breweries?[3]

A.

At the outset, the parties dispute who is a "manufacturer" under the Franchise Act. Cavalier emphasizes that the breweries "manufacture[]" the beer. *Id.* § 1333.82(B). Lime points out that Shelton Brothers "suppl[ied] alcoholic beverages to distributors" in Ohio. *Id.*; *see Dayton Heidelberg Distrib. Co. v. Vineyard Brands, Inc.*, 74 F. App'x 509, 512 (6th Cir. 2003) (importers are "manufacturers"). The operative question, however, is which party entered a protected franchise with Cavalier?[4] In other words, which party is subject to the Act's for-cause termination restrictions?[5]

We agree with the district court's conclusion: Cavalier's franchise was with Shelton Brothers, not the breweries. *See Cavalier*, 2023 WL 2384440, at *5–7. The Franchise Act's provisions and caselaw both suggest that a franchise arises between a distributor and the party that

---

[3] The parties do not argue that a franchise could have applied to both Shelton Brothers and the breweries. Accordingly, we do not address that theory here.

[4] We leave open the question whether a brewery could ever be a "manufacturer" if it plays no role in the Ohio market. The Franchise Act defines a manufacturer as a party that "manufactures or supplies alcoholic beverages to distributors in [Ohio]." Ohio Rev. Code Ann. § 1333.82(B). Under one reading of this statute, the prepositional phrase "to distributors in [Ohio]" suggests that a brewery must have a direct relationship with a distributor to be a "manufacturer." Alternatively, one could read the prepositional phrase as applying only to "supplies" and not "manufactures." Under that reading, any brewery could qualify as a "manufacturer," regardless of its ties to Ohio. In any event, we need not decide this issue. Even if we assume the breweries could be "manufacturer[s]" under the Franchise Act, we conclude that they are not in a protected franchise with Cavalier.

[5] Had Cavalier signed a written franchise agreement with the breweries, this would be an easy question. But they didn't. Instead, the parties offer competing theories about which party is subject to Cavalier's implied franchise.

controls the beer brand. And on the record currently before us, Shelton Brothers appears to have been that party.

1.

Start with the Franchise Act's text. The Act imposes several nonwaivable rules that govern all franchises. *See* Ohio Rev. Code Ann. § 1333.84(B)–(E). These franchise rules govern manufacturers with respect to (1) selecting Ohio distributors, (2) imposing requirements on those distributors, (3) managing distributors' orders, and (4) requiring distributor participation in advertising campaigns. *Id.*

For these rules to have any effect, a franchise must apply to the party that controls these four functions. After all, it wouldn't make sense to apply rules about advertising and selecting distributors to a party that doesn't advertise or select distributors. Moreover, courts must apply the Franchise Act in a way that gives effect to its provisions. *See Esber Beverage Co. v. Heineken USA*, 2011-Ohio-5939, at ¶ 22 (Ohio Ct. App. 2011). Thus, a franchise under the Act must apply to a party that controls these functions in Ohio.

Here, that party appears to have been Shelton Brothers. First, Shelton Brothers selected distributors without the breweries' input. Testimony showed that "the Breweries themselves exercised no meaningful control over who distributed their beers, leaving that decision entirely to Shelton Brothers (and apparently now to Lime)." *Cavalier*, 2023 WL 2384440, at *6. Second, Shelton Brothers was Cavalier's point of contact for the beer and had a distribution agreement with Cavalier. Third, when Cavalier ordered shipments of lambic beer, it ordered through Shelton Brothers, which owned the imported beer. And fourth, Shelton Brothers, not the breweries, advertised the beer in the United States.

By contrast, the breweries didn't perform any of these functions for Cavalier. Indeed, it appears Cavalier personnel never interacted with the breweries before Shelton Brothers' bankruptcy. So holding that Cavalier's franchise was with the breweries would render the Act's franchise rules ineffectual—precisely what courts must avoid doing. *See Esber*, 2011-Ohio-5939, at ¶ 22.

Thus, the Franchise Act suggests that Shelton Brothers, not the breweries, is subject to Cavalier's franchise.[6]

2.

Caselaw reinforces this conclusion. When applying the Franchise Act to a change in U.S. importers, courts consistently hold that a franchise applies to the party that owns and controls the beer brand in Ohio. *E.g.*, *BelVino LLC v. Empson (USA) Inc.*, 2012-Ohio-3074, at ¶ 34 (Ohio App. Ct. 2012); *Hill Distrib. Co. v. St. Killian Importing Co.*, No. 11-CV-706 (ALM), 2011 WL 3957255, at *3 (S.D. Ohio Sept. 7, 2011); *see also InBev USA v. Hill Distrib. Co.*, No. 05-CV-00298 (JLG), 2006 WL 6924045, at *6 (S.D. Ohio Apr. 3, 2006); *Esber*, 2011-Ohio-5939, at ¶¶ 24–25. To determine which party owns and controls a brand, courts apply a totality-of-the-circumstances test of sorts. Under this test, courts consider which party owns the intellectual property, conducts product marketing, chooses distributors, and makes business decisions for the product. *St. Killian*, 2011 WL 3957255, at *3 (intellectual property and marketing); *Tri Cnty. Wholesale Distribs., Inc. v. Labatt USA Operating Co.*, 828 F.3d 421, 427 (6th Cir. 2016) (business decisions).

---

[6] This conclusion doesn't foreclose the possibility that a franchise could bind both an importer and a brewery when the two parties collectively perform these functions. *See supra* n.3.

On the evidence presented thus far, Shelton Brothers was that party.[7] Shelton Brothers designed the products' labels. It controlled marketing in the United States. It even had input on beer recipes. Distributors—including Cavalier—marketed the beers as "Shelton Brothers brands." And most importantly, Shelton Brothers maintained exclusive control over distribution decisions and the flow of product in the United States.

To be sure, the breweries retained some control. They owned the relevant trademarks and could switch U.S. importers at will. Cavalier also urges the court to focus on who actually brews the beer. Yet caselaw demonstrates that the control test doesn't hinge on who originally makes the product. Rather, the test focuses on who controls the physical product as it moves through the market in Ohio. As the district court acknowledged, the Act can be understood as creating franchise obligations against the party "that select(s) the Ohio distributors, thereby controlling the flow of product into their hands." *Cavalier*, 2023 WL 2384440, at *7. And here, neither of the breweries actively directed U.S. brand development, marketing, or distribution. So it's hard to say they "controlled" anything about their beer brands in Ohio.

Thus, under Franchise Act caselaw, Cavalier's franchise was with Shelton Brothers.

3.

Cavalier disagrees. It contends that if franchise restrictions only apply to importers, then foreign breweries could circumvent the Franchise Act's for-cause termination rules. Whenever a brewery wanted to exit a franchise with an Ohio distributor, all it would need to do is switch importers. Because the franchise only bound the old importer, the new importer could evade the

---

[7] Our conclusion today is based on the limited evidence available at this point in the litigation. As the district court rightly noted, further factual development could show that the breweries exercised a greater degree of control over the brands than is apparent on the facts thus far. *See Cavalier*, 2023 WL 2384440, at *7.

franchise by picking a new Ohio distributor. This, Cavalier claims, would eviscerate the Franchise Act's protections for distributors.

But this critique misconstrues the relevant analysis and conclusion. We're not holding that franchises "never" apply to foreign breweries. Appellant's Br. 9. Rather, we hold that when a brewery exercises *no* control over its product in Ohio, it's not subject to the state's franchise laws.

C.

At this stage of the litigation, it appears Cavalier's franchise was with Shelton Brothers, not the breweries. That means Cavalier's argument is unlikely to succeed on the merits. If Cavalier didn't have a franchise with the breweries, Lime Ventures couldn't have wrongfully terminated it.[8]

III.

The other preliminary injunction factors also weigh against an injunction.

*Irreparable harm.* The district court correctly noted that Cavalier's loss of the breweries' beer could harm its goodwill with retailers. And under our precedent, the loss of goodwill constitutes irreparable harm, even if the affected product only constitutes a small portion of a distributor's portfolio. *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co*., 860 F.3d 844, 853 (6th Cir. 2017). Thus, this factor weighs in support of an injunction.

*Balance of equities.* Cavalier argues that its loss of retailer goodwill outweighs any harms that an injunction might cause. The district court disagreed, and so do we. An injunction would prevent Lime Ventures from fulfilling its agreement to supply lambic beer to its current Ohio

---

[8] In its reply brief, Cavalier argues for the first time that Lime Ventures was the "successor manufacturer" to Shelton Brothers. Thus, Cavalier argues, Lime Ventures inherited Shelton Brothers' franchise obligations to Cavalier. *See* Ohio Rev. Code Ann. § 1333.85(D). Whatever the merits of that argument, we don't consider it here. Parties may not raise new arguments in a reply brief. *See United States v. Carson*, 560 F.3d 566, 587 (6th Cir. 2009).

distributor. At the very least, this would harm that distributor. Moreover, an injunction would bar Lime Ventures from selling lambic beer to *any* Ohio distributor other than Cavalier. This could deprive Ohioans of the breweries' beer altogether. Sure, Lime Ventures could sell lambics to Cavalier under the injunction. But the two parties previously failed to make a deal, and the prospects seem even lower now that they're on opposite sides of a lawsuit. Thus, the balance of equities cuts against an injunction.

*Public Interest*. While the Franchise Act serves the public interest by protecting Ohio distributors, Cavalier has failed to show that Lime Ventures has violated the Act. Thus, it's difficult to say that enjoining Lime Ventures would advance the Act and its goals. By contrast, the public has an interest in the availability of the breweries' beer in Ohio. And as noted above, an injunction would threaten that availability.

\* \* \*

Cavalier hasn't met its burden for a preliminary injunction. We affirm.