*Frederick P. Winner, LTD v. Pabst Brewing Company*, Case No. 1882, September Term 2019. Opinion filed on January 29, 2021, by Berger, J.

MARYLAND BEER FRANCHISE FAIR DEALING ACT - SUCCESSOR BEER MANUFACTURER - CHANGE IN OWNERSHIP AND AT CORPORATE GRANDPARENT LEVEL - CHANGE IN CORPORATE STRUCTURE

The Maryland Beer Franchise Fair Dealing Act protects beer distributors by generally prohibiting not for cause terminations of distributorships by beer manufacturers. A "successor beer manufacturer" may terminate a distributorship under certain circumstances but is required to remunerate the terminated distributor. A change in the corporate structure and a change in ownership at a beer manufacturer's corporate grandparent level did not render the entity a "successor beer manufacturer" under the statute when the entity with the right to sell, distribute, or import the brands of beer remained the same, and, therefore, was not replaced.

Circuit Court for Baltimore County
Case No. 03-C-15-004824

REPORTED

IN THE COURT OF SPECIAL APPEALS

 OF MARYLAND

No. 1882

September Term, 2019

_____

FREDERICK P. WINNER, LTD

v.

PABST BREWING COMPANY

_____

Kehoe,
Berger,
Reed,

JJ.

_____

Opinion by Berger, J.

_____

Filed: January 29, 2021

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This is the second time this case has been before us on appeal. This appeal arises from the termination by Pabst Brewing Company, Inc. ("Pabst Brewing") of distribution rights that it had previously granted to beer distributor Frederick P. Winner, Ltd. ("Winner"). After Pabst Brewing came under new ownership in 2014, it terminated Winner's distributorship. Winner filed suit against Pabst Brewing in the Circuit Court for Baltimore County, alleging, *inter alia*, that the termination of Winner's distribution rights violated the Maryland Beer Franchise Fair Dealing Act ("BFFDA").[1] Winner subsequently filed an amended complaint in the circuit court. Pabst Brewing moved to strike the amended complaint, and the circuit court granted Pabst Brewing's motion to strike. On appeal, we vacated the trial court's order striking Winner's amended complaint and remanded for further proceedings. On remand, the circuit court granted Pabst Brewing's motion for summary judgment and denied Winner's motion for partial summary judgment. Winner again appealed.

In this appeal, Winner presents four questions for our review.[2] We shall address only the following single issue because it is dispositive of the appeal:

---

[1] At the time Pabst Brewing terminated Winner's distribution rights, the BFFDA was codified at Md. Code, (1957, 2011 Repl. Vol.), Article 2B, § 17-101 *et seq.* (black volume). Effective July 1, 2016, the BFFDA was recodified without substantive change at Md. Code (2016), § 5-101 *et. seq.* of the Alcoholic Beverages Article (red volume) ("AB"). The parties cite the prior code references in their briefs, but, in this opinion, we shall cite the current code sections.

[2] The questions, as presented by Pabst Brewing, are:

> 1. Whether Pabst [Brewing] may terminate Winner's distribution rights without cause, where Md. Code, Art.

Whether the circuit court erred by determining that Pabst Brewing and its parent and grandparent companies satisfied the definition of "successor beer manufacturer" set forth in the BFFDA and, accordingly, that Pabst Brewing's termination of Winner's distributorship was permitted as a matter of law.

As we shall explain, we shall reverse the judgment of the circuit court and remand for further proceedings.

## FACTS AND PROCEEDINGS

We previously set forth the relevant underlying facts in *Frederick P. Winner, Ltd. v. Pabst Brewing Co.*, No. 1165, Sept. Term 2016 (filed Nov. 21, 2017) (unreported opinion), as follows:

### *Factual Circumstances*

On April 30, 2014, Winner entered into a distributorship agreement ("2014 Agreement") with Pabst [Brewing], a supplier of malt beverages operating in Maryland as a non-

---

2B, § 17-103 prohibits the termination of a beer distributor without cause?

2. Whether Pabst [Brewing] may terminate Winner's distribution rights where no entity has "replace[d Pabst Brewing] with the right to sell, distribute, or import" the Pabst [Brewing] brands in Maryland, as required under Md. Code, Art. 2B, § 21-103?

3. Whether Pabst [Brewing] may terminate Winner's distribution rights without first paying to Winner the fair market value of those distribution rights, as required by Md. Code, Art. 2B, § 21-103?

4. Whether the Circuit Court erred in granting summary judgment in favor of Pabst [Brewing], where Pabst [Brewing] is not entitled to judgment as a matter of law and there exist disputes of material fact?

2

resident dealer. Under the 2014 Agreement, Winner had the right to sell twenty-two brands of Pabst [Brewing] products. The 2014 Agreement supplanted a previous distributorship agreement that Pabst had made with an earlier incarnation of Winner on January 31, 1994 ("1994 Agreement").[3]

When the parties entered into the 2014 Agreement, Pabst [Brewing] was a Delaware corporation and a wholly-owned subsidiary of Pabst Holdings Inc., which was, in turn, a wholly-owned subsidiary of Pabst Corporate Holdings, Inc. On November 13, 2014, Pabst [Brewing] became a Delaware limited liability company. On the same day, Pabst Corporate Holdings, Inc. sold its interest in Pabst Holdings, Inc. to Blue Ribbon, LLC. In the wake of the acquisition, Pabst [Brewing] replaced all of its directors and officers.

On March 9, 2015, Pabst [Brewing] informed Winner that it was terminating Winner's distribution rights effective May 8, 2015. In Pabst [Brewing]'s view, Pabst [Brewing] had become a "successor beer manufacturer" as defined by the BFFDA and was, therefore, entitled to terminate its agreement with Winner. In response, Winner's attorney sent a letter to Pabst [Brewing] asserting that Pabst [Brewing] was not a "successor beer manufacturer" and that, consequently, Pabst [Brewing] had no legal right to terminate the 2014 Agreement. Despite Winner's protest, Pabst [Brewing] refused to rescind its termination letter.

*Winner*, *supra*, slip op. at 3-4.

In its brief, Pabst Brewing provided a helpful chart illustrating the change in the Pabst Brewing Corporate Structure, which we have reproduced below:

---

[3] The current incarnation of Winner is the result of a merger between Frederick P. Winner, Ltd. and MMA Beverage Inc. that occurred on April 28, 2014. Although this change in corporate form was apparently the catalyst for the 2014 Agreement between Winner and Pabst [Brewing], it is not relevant to our resolution of the case. [(Footnote in original.)]

Pabst Ownership Structure April 2014



Pabst Corporate Holdings, Inc.

Pabst Holdings, Inc.

**Pabst Brewing Company**

Pabst Ownership Structure November 13, 2014



*Blue Ribbon, LLC*

Pabst Holdings, Inc.

**Pabst Brewing Company**

We previously set forth much of the relevant procedural history of this case in our previous unreported opinion in this case as follows:

### Procedural History

On May 4, 2015, Winner filed a complaint in the Circuit Court of Baltimore County asserting two causes of action: (1) an action for declaratory judgment; and (2) an action for breach of contract. The Initial Complaint sought the following forms of relief: (a) a declaration that Pabst [Brewing] had no basis to terminate Winner's franchise; (b) a permanent injunction prohibiting Pabst [Brewing] from terminating Winner's distributorship; (c) an order preliminarily and permanently enjoining Pabst [Brewing] from contracting with other distributors for Winner's territories; (d) an order preliminarily and permanently enjoining Pabst [Brewing] from interrupting delivery of Pabst [Brewing] products to Winner, and (e) an award of damages Winner sustained as a result of Pabst [Brewing]'s violations of the BFFDA.

4

Winner's Initial Complaint, however, contained a few mistakes. Although Winner's relationship with Pabst [Brewing] was governed by the 2014 Agreement, the Initial Complaint referred to the 1994 Agreement as the basis for Winner's claims. The Initial Complaint did not explicitly mention the 2014 Agreement at all, although it contained language consistent with an ongoing contractual relationship. Winner also attached the 1994 Agreement, rather than the 2014 Agreement, to the Initial Complaint.

On June 19, 2015, Pabst [Brewing] notified Winner that it was terminating product deliveries to Winner effective July 24, 2015, at which point the successor distributors would take over distribution of the Pabst [Brewing] brands. On July 21, 2015, the circuit court issued a scheduling order. Under the scheduling order, discovery was to be closed by . . . January 9, 2016, and all motions (excluding motions in limine), were to be filed on or before January 24, 2016.

On August 3, 2015, Pabst [Brewing] sent a letter to Winner reiterating that Winner's distribution rights had been terminated and that henceforth its brands could only be distributed by the successor distributors. On August 4, 2015, Winner filed a request for a temporary restraining order ("TRO") against Pabst [Brewing]. The circuit court denied the request. Thereafter, Pabst [Brewing] completed the termination of Winner's rights and entered into distribution agreements with seven local distributors.

On January 21, 2016, Winner filed the Amended Complaint without leave of the circuit court. The Amended Complaint left the basic claims of the Initial Complaint intact. It corrected the Initial Complaint, however, by referring to the 2014 Agreement as the basis for Winner's contractual claims. The Amended Complaint also anticipated a [potential] finding that Pabst [Brewing] was, indeed, a "successor beer manufacturer," arguing that such a finding would actually entitle Winner to an award of the fair market value of the distribution rights. Finally, the Amended Complaint revised the request for injunctive relief by seeking an order requiring Pabst [Brewing] to reinstate Winner and terminate the successor distributors.

5

On February 4, 2016, Pabst [Brewing] filed a motion to strike the Amended Complaint. On January 27, 2016, Winner filed a motion for partial summary judgment. The same day, Pabst [Brewing] filed its own motion for summary judgment. On March 3, 2016, the clerk of the circuit court issued a notice setting a trial date for October 17, 2016.

On April 26, 2016, the circuit court entertained a hearing on the open motions. Thereafter, on June 28, 2016, the Circuit Court for Baltimore County issued a Memorandum Opinion on the parties' motions. The circuit court granted Pabst [Brewing]'s motion to strike the Amended Complaint on the grounds that allowing it to stand would result in prejudice to Pabst [Brewing]. The circuit court then granted Pabst [Brewing]'s motion for summary judgment, finding that the Initial Complaint's request for declaratory judgment was moot and that the contractual claim failed because the 1994 Agreement was no longer in force. Although the circuit court had stricken the Amended Complaint, it nonetheless proceeded to address Pabst [Brewing]'s arguments concerning the Amended Complaint. Finally, the circuit court considered Winner's motion for partial summary judgment, which it understood to be based on the contract claim in the Amended Complaint. The Circuit Court, siding with Pabst [Brewing] on the merits, denied Winner's motion for partial summary judgment.

*Winner*, *supra*, slip op. at 4-6.

Winner appealed to this Court. On appeal, we vacated the trial court's order striking Winner's amended complaint and remanded for further proceedings. On remand, Winner filed a Second Amended Complaint on January 16, 2018. Count I of the Second Amended Complaint claimed a violation of the BFFDA and sought an injunction reinstating Winner's distribution rights as well as damages "including, but not limited to, the loss of the value of the . . . distributorship rights and a loss [of] the value of . . . Winner's enterprise." Count II of the Second Amended Complaint alleged a breach of contract and sought monetary

6

damages. Winner moved for partial summary judgment on the Second Amended Complaint on February 6, 2018. Winner also produced supplemental interrogatory responses providing calculations of damages including the fair market value of Winner's distribution rights, as well as details regarding how the termination of the distribution rights resulted in additional negative financial consequences for Winner. Pabst Brewing filed its own Motion for Summary Judgment on August 7, 2019.

On November 22, 2019, the circuit court entered summary judgment in favor of Pabst Brewing and denied Winner's motion for partial summary judgment. The circuit court found that Pabst Brewing's parent company, Blue Ribbon, was a successor beer manufacturer, and, therefore, that Pabst Brewing's not-for-cause termination of Winner's distribution rights was permitted as a matter of law. The circuit court found that Winner would have been entitled to an award of the fair market value of its distribution rights but concluded that Winner's request for a fair market value award was time-barred. The circuit court additionally found that Pabst Brewing's termination of Winner's distribution rights did not constitute a breach of contract as a matter of law due to Pabst Brewing's status as a successor beer manufacturer. Winner appealed.

Additional facts shall be addressed as necessitated by our discussion of the issues on appeal.

### STANDARD OF REVIEW

The entry of summary judgment is governed by Maryland Rule 2-501, which provides:

> The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

Md. Rule 2-501(f).

The Court of Appeals has described the standard of review to be applied by appellate courts reviewing summary judgment determinations as follows:

> On review of an order granting summary judgment, our analysis "begins with the determination [of] whether a genuine dispute of material fact exists; only in the absence of such a dispute will we review questions of law." *D'Aoust v. Diamond*, 424 Md. 549, 574, 36 A.3d 941, 955 (2012) (quoting *Appiah v. Hall*, 416 Md. 533, 546, 7 A.3d 536, 544 (2010)); *O'Connor v. Balt. Cnty.*, 382 Md. 102, 110, 854 A.2d 1191, 1196 (2004). If no genuine dispute of material fact exists, this Court determines "whether the Circuit Court correctly entered summary judgment as a matter of law." *Anderson v. Council of Unit Owners of the Gables on Tuckerman Condo.*, 404 Md. 560, 571, 948 A.2d 11, 18 (2008) (citations omitted).

> Thus, "[t]he standard of review of a trial court's grant of a motion for summary judgment on the law is *de novo*, that is, whether the trial court's legal conclusions were legally correct." *D'Aoust*, 424 Md. at 574, 36 A.3d at 955.

*Koste v. Town of Oxford*, 431 Md. 14, 24-25 (2013).

This case involves the interpretation of a Maryland statute. "The interpretation of a statute is a question of law that [Maryland appellate courts] review[] de *novo*." *Johnson v. State*, 467 Md. 362, 371 (2020). The Court of Appeals has recently reiterated the well-established principles courts apply when interpreting statutes as follows:

> "This Court provides judicial deference to the policy decisions enacted into law by the General Assembly. We assume that the legislature's intent is expressed in the statutory

language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly." *Blackstone v. Sharma*, 461 Md. 87, 113, 191 A.3d 1188 (2018) (quoting *Phillips v. State*, 451 Md. 180, 196, 152 A.3d 712 (2017)).

The statutory construction analysis begins "with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Id.* (quoting *Schreyer v. Chaplain*, 416 Md. 94, 101, 5 A.3d 1054 (2010)). We read "the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Phillips*, 451 Md. at 196-97, 152 A.3d 712 (quoting *Douglas v. State*, 423 Md. 156, 178, 31 A.3d 250 (2011)).

"We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone." *Wash. Gas Light Co. v. Md. Pub. Serv. Comm'n*, 460 Md. 667, 685, 191 A.3d 460 (2018) (quoting *Lockshin v. Semsker*, 412 Md. 257, 275, 987 A.2d 18 (2010)). The plain language "must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute." *State v. Johnson*, 415 Md. 413, 421, 2 A.3d 368 (2010) (quoting *Lockshin*, 412 Md. at 276, 987 A.2d 18). Our search for legislative intent contemplates "the consequences resulting from one construction rather than another." *Blaine v. Blaine*, 336 Md. 49, 69, 646 A.2d 413 (1994) (citing *Kaczorowski v. City of Balt.*, 309 Md. 505, 513, 525 A.2d 628 (1987)).

"We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Johnson*, 415 Md. at 421-22, 2 A.3d 368 (quoting *Lockshin*, 412 Md. at 276, 987 A.2d 18). When the "words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as a part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative

intent in other indicia[.]" *State v. Bey*, 452 Md. 255, 266, 156 A.3d 873 (2017) (quoting *Johnson*, 415 Md. at 422, 2 A.3d 368); *cf. Blaine*, 336 Md. at 64, 646 A.2d 413 ("Even where the language of a statute is plain and unambiguous, we may look elsewhere to divine legislative intent; the plain meaning rule is not rigid and does not require us to read legislative provisions in rote fashion and in isolation.") (citing *Motor Vehicle Admin. v. Shrader*, 324 Md. 454, 463, 597 A.2d 939 (1991)). Absent ambiguity in the text of the statute, "it is our duty to interpret the law as written and apply its plain meaning to the facts before us." *In re S.K.*, 466 Md. 31, 54, 215 A.3d 300 (2019).

*Johnson v. State*, 467 Md. 362, 371-73 (2020).

## DISCUSSION

The issue before us in this appeal is quite narrow. We must determine whether Pabst Brewing and/or its parent or grandparent companies constitute a "successor beer manufacturer" under the relevant statute. The Maryland Beer Franchise Fair Dealing Act ("BFFDA") was enacted in 1974 with the stated purposes of "foster[ing] and promot[ing] temperance in the consumption of beer" and "promot[ing] respect for and obedience to the laws that control the distribution and sale of beer." AB § 5-103(a)(1).[4] One way in which the BFFDA operates to protect distributors is by limiting the circumstances under which a beer manufacturer may terminate a distributorship and by generally prohibiting

---

[4] The General Assembly expressly recognized that legislation was "necessary to accomplish this policy to eliminate the undue stimulation of sales of beer in the State by beer manufacturers that induce or coerce, or attempt to induce or coerce, beer distributors to act detrimentally to the orderly and lawful distribution of beer by (1) threatened or actual termination of the beer manufacturer and beer distributor relationship, directly or indirectly; (2) the establishment of dual beer distributors of a brand or brands of beer in a sales territory presently served by a beer distributor; or (3) the sale of the same brand or brands of beer in one sales territory by more than one franchisee." AB § 5-103(b).

not-for-cause terminations of distributorships. AB §§ 5-107 & 5-108. The statute provides that "[n]otwithstanding the terms of a beer franchise agreement, a franchisor may not terminate or refuse to continue or renew a beer franchise agreement, or cause a franchisee to resign from a beer franchise agreement, without good cause." AB § 5-108(b)(ii).

Section 5-201 of the Alcoholic Beverages Article addresses the obligations of a "successor beer manufacturer." It is this section that is at the center of this appeal. Pabst Brewing asserts that its grandparent company, Blue Ribbon, is a "successor beer manufacturer" that was permitted to terminate Winner's distributorship; Winner asserts that Pabst Brewing and Blue Ribbon do not satisfy the definition of "successor beer manufacturer" and, therefore, Pabst Brewing was not permitted to terminate Winner's distributorship. Pursuant to AB § 5-201, a successor beer manufacturer may terminate an agreement made between a distributor and the predecessor beer manufacturer but the successor beer manufacturer "shall remunerate the beer wholesaler a sum equal to the fair market value for the sale of the subject brand or brands of beer calculated from the date of termination."

The statute defines a beer manufacturer as "(i) a brewer, fermenter, processor, bottler, or packager of beer located in or outside the State; or (ii) a person located in or outside the State that enters into an agreement with a beer wholesaler doing business in the State." AB § 5-201(a)(3). The statute also defines the term "successor beer manufacturer," providing that "'[s]uccessor beer manufacturer' includes a person or license holder who replaces a beer manufacturer with the right to sell, distribute, or import a brand of beer." AB § 5-201(a)(5).

11

We briefly revisit the 2014 change in Pabst Brewing's ownership structure before delving into our analysis of whether the successor beer manufacturer statute is implicated in this case. Winner and Pabst Brewing entered into the 2014 Agreement on April 30, 2014, which supplanted a prior agreement that had begun January 31, 1994. When the parties entered into the 2014 Agreement, Pabst Brewing was a Delaware Corporation and a wholly-owned subsidiary of Pabst Holdings, Inc., which was, in turn, a wholly-owned subsidiary of Pabst Corporate Holdings, Inc., which was controlled by Dean Metropoulos. As of November 13, 2014, Pabst Brewing became a Delaware limited liability company and Pabst Corporate Holdings, Inc. sold its interest in Pabst Holdings, Inc. to Blue Ribbon, LLC, which was controlled by Eugene Kashper. Following the acquisition, Pabst Brewing replaced its directors and officers.

Barbara J. Hruby, Pabst Brewing's Manager of Government Affairs, sent a letter to the Comptroller of Maryland advising that "on November 13, 2014, a new group of investors completed the purchase [of] all of the equity interests of Pabst Holdings, LLC, the parent of Pabst Brewing Company, which holds the above license(s)/permit(s)." Pabst Brewing advised that it would "file amended Brewer's Notices and permits with the federal Alcohol and Tobacco Tax and Trade Bureau" but explained that Pabst Brewing "will continue to be the operating company doing business with the same Employer Identification Number (EIN)." Pabst Brewing further explained:

> For business tax planning purposes, the parties to the transaction did elect to be treated as a limited liability company immediately prior to closing, but no new entity was formed and all basic business functions will continue uninterrupted. All existing bonds will be updated with the information on the new

12

owners. Pabst brands will remain the same after closing and distribution to retailers will continue through the three-tier system. While Pabst Brewing Company will have several new senior executives in its management team, many veteran executives and most of the other Pabst employees remain, including members of the existing compliance team. We do not anticipate immediate changes in day-to-day operations.

Pabst Brewing further provided the names of the new officers as well as the names of former officers who had submitted their resignations. Following the change in ownership, Winner received a letter terminating its distributorship. The letter was written on the letterhead of "Pabst Brewing Company."[5]

We must determine whether the change in Pabst Brewing's corporate structure in 2014, coupled with the change in ownership at Pabst Brewing's grandparent level, rendered Pabst Brewing and/or its parent and grandparent companies "successor beer manufacturers" under the statute. Answering this question requires us to decide if Pabst Brewing and/or Blue Ribbon is, pursuant to AB § 5-201(a)(5), "a person or license holder who replaces a beer manufacturer with the right to sell, distribute, or import a brand of beer."

In explaining why it concluded that Blue Ribbon was a successor beer manufacturer, the trial court emphasized that "Blue Ribbon, LLC now owns the Pabst brands and has complete control over every aspect of Pabst's business, and therefore, is a successor beer

---

[5] Pabst Brewing explains that the termination was done on the "Pabst Brewing Company" letterhead because "internally within Kashper's beer enterprises, all the various legal entities -- including Blue Ribbon LLC, other Blue Ribbon entities, Pabst Brewing Company LLC, Pabst Holdings, LLC, and Falstaff Brewing Company, LLC -- are colloquially referred to as 'Pabst Brewing Company.'"

manufacturer." As we shall explain, we disagree with the circuit court. First, we observe that Eugene Kashper, the CEO of both Blue Ribbon, LLC and Pabst Brewing Company LLC, submitted an affidavit declaring that Blue Ribbon "owns 100% of the shares of Pabst Holdings, LLC, which owns the membership interests of Pabst Brewing Company, LLC." Contrary to the trial court's finding that Blue Ribbon owns the Pabst Brewing brands, Mr. Kashper stated in his affidavit that "Pabst Brewing Company LLC owns the Pabst brands of beer." Mr. Kashper maintained, however, that "[e]ffectively, through Blue Ribbon, LLC, I am the owner of the Pabst brands." Furthermore, Pabst Brewing's former General Counsel, Michael J. Kramer, explained that Blue Ribbon's purchase of Pabst Holdings, Inc. "was structured as a sale of stock and not a sale of assets" and did not "involve the sale of any brands belonging to [Pabst Brewing]," nor did the transaction include "any assignments of [Pabst Brewing's] trademarks, or any assignments of contracts related to [Pabst Brewing's] brands."

In our view, the trial court overemphasized the ownership of Pabst Brewing's parent company and Mr. Kashper's control of Pabst Brewing through his ownership interest in Blue Ribbon. The definition of successor beer manufacturer does not refer to the control of a company, but rather provides that a successor beer manufacturer is "a person or license holder who replaces a beer manufacturer with the right to sell, distribute, or import a brand of beer." Pabst Brewing urges us to adopt a "control-based" test and conclude that because Blue Ribbon's purchase of Pabst Holdings, Inc. served to change the entity in control of Pabst Brewing, Blue Ribbon is therefore a successor beer manufacturer.

14

Pabst Brewing asserts that other courts have adopted a control-based test and that we should similarly do so. In particular, Pabst Brewing points to the decision of the United States Court of Appeals for the Sixth Circuit in *Tri County Wholesale Distributors v. Labatt USA Operating Co.*, 828 F.3d 421 (6th Cir. 2016). Like the case before us in this appeal, *Tri County* required a determination of whether a supplier satisfied a definition of a successor beer manufacturer, and, therefore, whether the supplier was permitted to terminate franchise agreements. 828 F.3d at 423. In *Tri County*, the appellate court employed a "functional, control-based approach" and reasoned that the supplier satisfied the successor beer manufacturer definition after a parent company acquired a holding company that, "through a series of . . . intermediate nesting holding companies," owned and controlled Labatt USA Operating. *Id.* at 424-27.

Critically, however, the language of the statute at issue in *Tri County* was far broader than the statute at issue in this appeal. The relevant Ohio statute at issue in *Tri County* provided that a "successor manufacturer" may terminate a distributor when "a successor manufacturer **acquires all or substantially all of the stock or assets** of another manufacturer through merger or acquisition." *Id.* at 429 (quoting Ohio Rev. Code § 1333.85(d)) (emphasis supplied).[6] This is a much broader definition than the definition of successor beer manufacturer under Maryland law, which recognized a successor as one

---

[6] Pabst Brewing also directs our attention to, *Bellas Co. v. Pabst Brewing Co.*, No. 15-873 (S.D. Ohio Mar. 27, 2017), an unpublished memorandum opinion from the United States District Court for the Southern District of Ohio in which the trial court construed the same Ohio successor manufacturer statute. In our view, as we explained with respect to the *Tri County* case, the significantly different language of the Ohio statute renders Pabst Brewing's reliance upon these cases misplaced.

15

who "replaces a beer manufacturer with the right to sell, distribute, or import a brand of beer." AB § 5-201(a)(5). Indeed, if the General Assembly had intended the determination of whether an entity is a successor beer manufacturer to be focused upon the control of the company and/or the acquisition of stock or assets, the legislature could have included such language in the statute. Instead, the General Assembly focused upon whether a beer manufacturer was "replaced" with an entity that has "the right to sell, distribute, or import a brand of beer." This is the clear and unambiguous language that we must apply to the undisputed facts presented in this case.

Pabst Brewing asserts that although the Maryland statute is, in Pabst Brewing's words, "not a model of clarity," a reading of the relevant statutory language compels the conclusion that Pabst Brewing, under the direction of Blue Ribbon, was permitted to terminate Winner's distributorship. We are not persuaded. The Maryland statute, unlike the Ohio statute discussed in *Tri County*, focuses on whether "a person or license holder" had "**replace[d]** a beer manufacturer with the **right to sell, distribute, or import a brand of beer**." AB § 5-201(a)(5) (emphasis supplied). Pabst Brewing expressly informed the Maryland Comptroller that although "investors completed the purchase all of the equity interests [sic] of Pabst Holdings, LLC," Pabst Brewing would "continue to be the operating company doing business with the same Employer Identification Number (EIN)." Pabst Brewing further informed the Comptroller that "the parties to the transaction did elect to be treated as a limited liability company immediately prior to closing, but no new entity was formed and all basic business functions [would] continue uninterrupted."

16

Furthermore, the undisputed evidence demonstrates that Blue Ribbon's purchase of Pabst Holdings, Inc. was "a sale of stock and not a sale of assets" and did not "involve the sale of any brands belonging to [Pabst Brewing]," nor did the transaction include "any assignments of [Pabst Brewing's] trademarks, or any assignments of contracts related to [Pabst Brewing's] brands." In our view, the sale of the equity interests in Pabst Brewing's parent company when Blue Ribbon purchased Pabst Holdings, Inc. from Pabst Corporate Holdings, Inc., did not constitute a "replacement" of Pabst Brewing, nor did the entity that had the "right to sell, distribute, or import a brand of beer" change. Prior to the 2014 transaction, Pabst Brewing, structured as a corporation, had the right to sell, distribute, or import certain brands of beer. Following the transaction, Pabst Brewing, structured as a limited liability corporation but operating under the same EIN and having reassured the Comptroller that no new entity had been formed, had the right to sell, distribute, or import the same brands of beer. A change in ownership and control occurred two rungs up the corporate chain, but the entity with the right to sell, distribute, or import the brands of beer remained the same, and, therefore, was not replaced.

This conclusion is compelled by the relevant statutory language, but further, the result is consistent with general well-settled principles of corporate law. "In Maryland, . . . a corporation is a distinct legal entity, separate and apart from its stockholders.'" *Gosain v. Cty. Council of Prince George's Cty.*, 420 Md. 197, 210 (2011) (quoting *Dean v. Pinder*, 312 Md. 154, 164 (1988)). Consistent with this principle, when determining whether an entity meets the definition of "successor beer manufacturer," we shall not blur the distinction between Pabst Brewing Company, LLC itself and its parent and grandparent

17

companies. *See id.* (expressly rejecting a petitioner's attempts "to blur the distinction between the corporations and the individuals owning the corporations").

For these reasons, we hold that the circuit court erred when it concluded that Blue Ribbon satisfied the statutory definition of "successor beer manufacturer." AB § 5-201(a)(5). As we have explained, neither Pabst Brewing nor its parent or grandparent entities satisfy the definition of AB § 5-201(a)(5). The circuit court's grant of summary judgment in favor of Pabst Brewing as to both counts was premised upon this incorrect conclusion. Accordingly, we hold the circuit court erred in granting summary judgment in favor of Pabst Brewing.

Having determined that the circuit court incorrectly granted summary judgment in favor of Pabst Brewing, we shall remand this case for further proceedings. Because, as we have explained, this case does not involve a successor beer manufacturer, we shall not address the issue of whether the circuit court erred in connection with its determination that Winner's statutory claim for a fair market value award was time-barred. The statutory fair market value compensation provision set forth in AB § 5-201(d) is no longer applicable in light of our determination that this case does not involve a successor beer manufacturer.

Furthermore, we shall not address additional matters not expressly decided by the circuit court. Specifically, we shall not address any issues relating to whether Pabst Brewing was permitted to terminate Winner's distributorship for cause, nor will we address whether Winner presented sufficient evidence to substantiate a claim for damages. We also take no position as to what, if any, remedy is permitted under the law when a beer manufacturer who does not satisfy the definition of "successor beer manufacturer"

18

terminates a distributor.  The circuit court did not make any determinations regarding these

issues and we will not, in the first instance, address them on appeal.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.  COSTS TO BE PAID BY THE APPELLEE.**