*Pabst Brewing Company v. Frederick P. Winner, Ltd.*, No. 8, September Term, 2021.
Opinion by Biran, J.


**STATUTORY INTERPRETATION – SUCCESSOR BEER MANUFACTURER –**
Maryland's Successor Manufacturers Law defines a "successor beer manufacturer" to
include "a person or license holder who replaces a beer manufacturer with the right to sell,
distribute, or import a brand of beer." Md. Code Ann., Alco. Bev. § 5-201(a)(5) (2016).
The Court of Appeals held that, in order to qualify as a successor beer manufacturer, a
"person or license holder" must replace a beer manufacturer as the license holder with
respect to a beer brand.

Circuit Court for Baltimore County
Case No. 03-C-15-004824
Argued: October 4, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 8

September Term, 2021

PABST BREWING COMPANY

v.

FREDERICK P. WINNER, LTD.

Getty, C.J.
*McDonald
Watts
Hotten
Booth
Biran
Wilner, Alan M.
    (Senior Judge, Specially Assigned),

        JJ.

Opinion by Biran, J.

Filed: March 25, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

*McDonald, J., now a Senior Judge, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, he also participated in the decision and adoption of this opinion.

Beer and other alcoholic beverages are among the most highly regulated products sold in Maryland. As stated in the Alcoholic Beverages Article of the Maryland Code, "[t]o obtain respect and obedience to law and to foster and promote temperance, it is the policy of the State to regulate and control: (1) the manufacture, sale, distribution, and storage of alcoholic beverages in the State; and (2) the transportation and distribution of alcoholic beverages into and out of the State." Md. Code Ann., Alco. Bev. ("AB") § 1-201(a)(1)(i).[1] Indeed, the General Assembly has authorized "the exercise of the powers provided by [the Alcoholic Beverages Article] to displace or limit economic competition by regulating … the sale or distribution of alcoholic beverages." Id. § 1-201(b)(1).

One such regulation restricts the ability of a beer manufacturer to terminate its contractual relationship with an entity that distributes its beer brand(s) in Maryland. In general, a beer manufacturer may not terminate or refuse to renew a contract with a distributor without cause. An exception exists where a "successor beer manufacturer" inherits a contract between a beer brand's previous manufacturer and the brand's distributor. Although a successor beer manufacturer is obligated under the terms of the pre-existing contract, the successor beer manufacturer may elect to terminate the contract without cause, in which case the distributor is entitled to receive the fair market value of the terminated distribution rights. In this case, we must decide who qualifies as a "successor beer manufacturer" under the pertinent Maryland statute, which is known as the Successor Manufacturers Law (the "SML"). See AB § 5-201.

---

[1] Unless otherwise noted, we cite to the 2016 volumes of the Alcoholic Beverages Article.

Pabst Brewing Company ("Pabst"), the Petitioner in this case, is one of the oldest beer manufacturers in the United States. Beginning in 1994, Pabst maintained a contractual relationship for more than 20 years with Respondent Frederick P. Winner, Ltd. ("Winner"), under which Winner and its predecessor entity distributed Pabst beer brands in Maryland. In 2014, Blue Ribbon, LLC ("Blue Ribbon") purchased 100 percent of the stock of Pabst's parent entity. In 2015, Pabst terminated its contract with Winner. Pabst claimed that Winner's termination was permitted under the SML. Winner disputed that contention, and sued Pabst in the Circuit Court for Baltimore County. The circuit court agreed with Pabst that Blue Ribbon was a successor beer manufacturer under the SML, and that Blue Ribbon therefore was permitted to cause Pabst to terminate its contract with Winner without cause.

The Court of Special Appeals disagreed with the circuit court's reading of the SML, as do we. As discussed below, the SML applies only where the beer manufacturer that holds a Maryland license or permit to sell, distribute, or import a brand of beer is replaced by another as the license holder with respect to that brand. In this case, Pabst held the pertinent Maryland permit both before and after Blue Ribbon acquired Pabst's parent entity. Thus, neither Blue Ribbon, nor any person or entity affiliated with Blue Ribbon, qualifies as a successor beer manufacturer, and Pabst therefore did not have the right to terminate its contract with Winner without cause.

# I

## Background

### A. The Statutory Scheme

The General Assembly has created a multi-tier system for the sale of beer and other alcoholic beverages in Maryland. Manufacturers sell to wholesalers (also referred to as distributors), who sell to retailers, who sell to consumers. Manufacturers, wholesalers, and retailers all must hold government-issued licenses or permits. *See, e.g.*, AB § 2-124(b)(1) & (d) (non-resident dealer's permit may be issued to a manufacturer, which allows the manufacturer to "sell beer … to license holders authorized to receive the beverages"); *id.* § 2-302 (Class 1 beer, wine, and liquor wholesaler's license); *id.* §§ 9-601(b) (Class A beer license for retail sale in Allegany County) & 11-901(b) (Class A beer, wine, and liquor license for retail sale in Anne Arundel County).

The Maryland Beer Franchise Fair Dealing Act ("BFFDA") governs beer franchise agreements between manufacturers and distributors. *See id.* § 5-101 *et seq.* A "beer franchise agreement" is defined, among other things, as "a relationship in which a beer manufacturer grants a beer distributor the right to offer and sell the brands of beer offered by the beer manufacturer." *Id.* § 5-101(c)(2) (Supp. 2021).

The BFFDA promotes temperance and respect for the laws that control the distribution and sale of beer by among other things: (1) prohibiting beer manufacturers from inducing or coercing beer distributors to accept delivery of alcoholic beverages the distributors did not order, or to perform illegal acts, *id.* § 5-104; (2) limiting the number of franchisees in a sales territory, *id.* § 5-105; and (3) prohibiting a franchisor from

terminating or refusing to continue or renew a beer franchise agreement without good cause, *id.* § 5-108 (Supp. 2021). The General Assembly concluded that, without these protections, a manufacturer could induce or coerce its distributor to unduly stimulate beer sales and consumption by threatening its distribution rights. *Id*. § 5-103(b).

In 1990, the General Assembly enacted the SML. *See* 1990 Md. Laws, ch. 281. The current version of the SML defines both a "[b]eer manufacturer" and a "[s]uccessor beer manufacturer." AB § 5-201(a)(3) & (a)(5). A "'[b]eer manufacturer' means: (i) a brewer, fermenter, processor, bottler, or packager of beer located in or outside the State; or (ii) a person located in or outside the State that enters into an agreement with a beer wholesaler doing business in the State." *Id*. § 5-201(a)(3). A "'[s]uccessor beer manufacturer' includes a person or license holder who replaces a beer manufacturer with the right to sell, distribute, or import a brand of beer." *Id*. § 5-201(a)(5).

Under the SML, "[e]xcept for the discontinuance of a brand of beer or for good cause shown as provided under § 5-108 of this title, a successor beer manufacturer that continues in the business is obligated under all the terms and conditions of the agreement made between the previous beer manufacturer and the existing beer wholesaler that were in effect on the date of change of beer manufacturers." *Id.* § 5-201(b). If a successor beer manufacturer "terminates any agreement provision required to be continued under subsection (b) of this section," the successor beer manufacturer "shall remunerate the beer wholesaler a sum equal to the fair market value for the sale of the subject brand or brands of beer calculated from the date of termination." *Id.* § 5-201(c).

4

The SML additionally provides that, before a successor beer manufacturer may terminate an agreement with a beer wholesaler "and designate another beer wholesaler to replace the existing beer wholesaler, the successor beer manufacturer shall give notice of termination to the beer wholesaler to be replaced." *Id.* § 5-201(d)(1). On receipt of the notice, "the beer wholesaler to be replaced and the designated beer wholesaler shall negotiate in good faith to determine the fair market value of the affected distribution rights." *Id.* § 5-201(d)(2). "Fair market value" is defined as "the price at which an asset would change hands between a willing seller and a willing buyer when neither is acting under any compulsion and when both have knowledge of all of the relevant facts." *Id.* § 5-201(a)(4).

If an agreement is reached, "the designated beer wholesaler promptly shall pay the fair market value as compensation to the beer wholesaler to be replaced." *Id.* § 5-201(d)(3). If an agreement is not reached within 30 days after the beer wholesaler to be replaced receives notice, "the designated beer wholesaler and the beer wholesaler to be replaced shall enter into nonbinding mediation." *Id.* § 5-201(d)(4). And if an agreement is not reached within 45 days after mediation begins, "the beer wholesaler to be replaced shall within 90 days bring an action in a court of general jurisdiction against a successor beer manufacturer to determine and award fair market value of the terminated brand or brands." *Id.* § 5-201(d)(5).

Until a resolution regarding the fair market value of the terminated distribution rights for the brand or brands is reached under subsection (d), and the beer wholesaler to be replaced has received payment for that fair market value, "the beer wholesaler to be

5

replaced and the successor beer manufacturer shall support the brand to at least the same extent that the brand had been previously supported immediately before the successor beer manufacturer acquired rights to the brand" and "the beer wholesaler to be replaced shall continue to distribute the brand." *Id.* § 5-201(e).

## B. The Relationship and Dispute Between Pabst and Winner

Pabst currently is a Delaware limited liability company with its principal place of business in San Antonio, Texas. Pabst's roots in the beer business go back to 1844. Today, Pabst's brands include Pabst Blue Ribbon, National Bohemian, Stroh's, Old Milwaukee, and Colt 45. Winner, doing business as Chesapeake Beverage, is a Delaware corporation with its principal place of business in Baltimore County, Maryland.

In 1994, Pabst and Winner's predecessor entity entered into a "distributorship agreement" (the "1994 Agreement"). On April 30, 2014, Pabst and Winner entered into a new "distributor agreement" (the "2014 Agreement"), which replaced the 1994 Agreement. The 2014 Agreement gave Winner the right to market various Pabst brands within a defined territory, which included various parts of Maryland. At the time the parties entered into the 2014 Agreement, Pabst was a Delaware corporation and a wholly-owned subsidiary of Pabst Holdings Inc. ("Pabst Holdings"), which, in turn, was a wholly-owned subsidiary of Pabst Corporate Holdings, Inc. ("PCH"), making PCH the grandparent corporation of Pabst. At this time, Pabst held Maryland Nonresident Dealer Permit ND-18627, which, as stated above, permitted Pabst to "sell beer … to license holders authorized to receive the beverages." AB § 2-124(d).

On November 13, 2014, Dean Metropoulos, the owner of PCH, reorganized Pabst and Pabst Holdings into Delaware limited liability companies, and caused PCH to sell its 100 percent ownership interest in Pabst Holdings, through a securities purchase agreement, to Blue Ribbon, an entity controlled by Eugene Kashper. According to the Senior Vice President and Chief Financial Officer of Pabst, Pabst Holdings, and Blue Ribbon, the new ownership structure of Pabst was created for "legal and tax purposes." Blue Ribbon's purchase of Pabst Holdings did not involve the sale of Pabst Holdings' or Pabst's assets. Nor did it involve any assignments of Pabst's trademarks, or any assignments of contracts related to Pabst's brands. After the closing of the transaction, Blue Ribbon replaced all of Pabst's directors and officers, and Mr. Kashper assumed full control and decision-making authority over the Pabst brands.

On November 13, 2014, Barbara J. Hruby, the Manager of Government Affairs for Pabst, sent a letter to the Office of the Comptroller of Maryland, Alcohol and Tobacco Tax Division, informing that body that, as of that date, "a new group of investors completed the purchase of all of the equity interests of Pabst Holdings, LLC, the parent of Pabst …, which holds [Maryland Nonresident Dealer Permit ND-18627]." Ms. Hruby further represented that

> Pabst … will continue to be the operating company doing business with the same Employer Identification Number (EIN). For business tax planning purposes, the parties to the transactions did elect to be treated as a limited liability company immediately prior to closing, but no new entity was formed and all basic business functions will continue uninterrupted…. Pabst brands will remain the same after closing and distribution to retailers will continue through the three-tier system.

7

Following the change in control of Pabst's operations from Mr. Metropoulos to Mr. Kashper, Pabst's new management evaluated its distributors in Maryland and elsewhere. Eventually, Mr. Kashper decided to replace Winner with several other distributors. On March 9, 2015, Pabst informed Winner that it was terminating the 2014 Agreement, effective May 8, 2015. Pabst referred to an obligation to compensate Winner for "the fair market value of the affected distribution rights after good faith negotiations between the parties." In response, on March 12, 2015, Winner's counsel sent a letter to Pabst asserting that the SML had no application to the relationship between Pabst and Winner, and that Pabst had no valid basis upon which to terminate the 2014 Agreement. Winner requested that Pabst rescind the notice of termination. Pabst refused to do so.

## C. The Litigation

### 1. Initial Circuit Court Proceedings and Appeal

On May 4, 2015, Winner filed a complaint in the Circuit Court for Baltimore County, seeking a declaration that Pabst had no right to terminate Winner's distributorship, as well as injunctive relief and damages for breach of contract. This initial complaint erroneously referred to the 1994 Agreement, instead of the 2014 Agreement, as the operative contract between Pabst and Winner. In its Complaint, Winner asserted that Pabst had improperly invoked the SML as justification for terminating Winner's distributorship.

On January 27, 2016, Winner moved for partial summary judgment, and Pabst cross-moved for summary judgment. On February 2, 2016, without leave of the circuit

8

court, Winner filed an Amended Complaint.[2] In the Amended Complaint, Winner again sought declaratory and injunctive relief, as well as damages for Pabst's alleged breach of contract. However, Winner referred to the 2014 Agreement as the basis for its breach of contract claim and requested as an alternative remedy – if Pabst were found to be a successor beer manufacturer – that the court award Winner the fair market value of its lost distribution rights. On February 4, 2016, Pabst moved to strike the Amended Complaint.

On June 28, 2016, the circuit court granted Pabst's motion to strike and motion for summary judgment. In striking Winner's Amended Complaint, the court ruled that the amended pleading introduced a new issue – the fair market value of Winner's distribution rights – which would prejudice Pabst by requiring it to engage in further discovery. The circuit court then found that the initial Complaint's request for declaratory judgment was moot and that the breach-of-contract claim failed because the 1994 Agreement was no longer in force. For these reasons, the court granted Pabst's motion for summary judgment.

The circuit court then considered and denied Winner's motion for partial summary judgment, which it understood to be based on the breach-of-contract claim in the Amended Complaint. The court concluded that Blue Ribbon was a successor beer manufacturer under the SML, and therefore, was entitled to terminate the 2014 Agreement. Further, the court ruled that Winner's claim for the fair market value of its distributor rights was time-barred.

---

[2] Winner's counsel averred in the certificate of service that Winner served the Amended Complaint on Pabst on January 21, 2016. However, the Amended Complaint was not docketed in the Circuit Court until February 2, 2016.

Winner appealed and, on November 21, 2017, the Court of Special Appeals vacated the circuit court's grant of summary judgment to Pabst. *Frederick P. Winner, Ltd. v. Pabst Brewing Co.*, No. 1165, Sept. Term 2016, 2017 WL 5593529 (Md. Ct. Spec. App. Nov. 21, 2017) ("*Winner I*"). The Court of Special Appeals concluded that the circuit court abused its discretion in striking Winner's Amended Complaint, and that the court's grant of summary judgment to Pabst necessarily was tainted by its erroneous striking of the Amended Complaint. *Id.* at *9. The intermediate appellate court declined to rule on the questions presented in the parties' competing summary judgment motions, including whether Blue Ribbon qualified as a successor beer manufacturer under the SML, and remanded the case to the circuit court for further proceedings. *See id.* at *9-*10.

2. Proceedings on Remand

Following the remand to the circuit court, Winner filed a Second Amended Complaint on January 16, 2018. Count I of the Second Amended Complaint alleged a violation of the BFFDA and sought declaratory relief, an injunction reinstating Winner's distribution rights, and damages. Count II realleged a breach of contract and sought damages. On February 16, 2018, Winner filed a motion for partial summary judgment. On August 7, 2019, Pabst cross-moved for summary judgment.

On November 22, 2019, the circuit court entered summary judgment in favor of Pabst and denied Winner's motion for partial summary judgment. The court reasoned that Blue Ribbon now owned the Pabst brands and had complete control of all aspects of Pabst's business. In other words, according to the circuit court, Blue Ribbon "replaced the Old Pabst Brewing Company" and, therefore, qualified as a successor beer manufacturer under

10

the SML. Thus, the termination of Winner's distribution rights without cause was permissible under the SML and did not constitute a breach of contract. Additionally, the court again concluded that Winner's claim to receive the fair market value of its distribution rights was time-barred.

3. Second Appeal

Winner again appealed, and the Court of Special Appeals reversed the circuit court's grant of summary judgment to Pabst. *Frederick P. Winner, Ltd. v. Pabst Brewing Co.,* 249 Md. App. 402, 413, 416 (2021) ("*Winner II*"). The Court of Special Appeals based its ruling on the definition of "successor beer manufacturer" in the SML, which does not refer to an entity's "control" of a beer manufacturer, but rather provides that a successor beer manufacturer includes "a person or license holder who replaces a beer manufacturer with the right to sell, distribute, or import a brand of beer." *Id*. at 417. The intermediate appellate court emphasized that Pabst expressly notified the Comptroller that, even though investors had purchased all the equity interests of Pabst Holdings, Pabst would "continue to be the operating company doing business with the same Employer Identification Number (EIN)." *Id*. at 419. Therefore, the Court of Special Appeals held, when Blue Ribbon purchased Pabst Holdings' interest in Pabst from PCH, this sale of the equity interests did not constitute a "replace[ment]" of Pabst within the meaning of the SML. That is, the entity that had the "right to sell, distribute, or import a brand of beer" did not change. *Id*. For this reason, the Court of Special Appeals held that Pabst was not a "successor beer manufacturer" under AB § 5-201(a)(5), and that the circuit court therefore erred in granting summary judgment to Pabst. *Id*. at 419-20.

11

Pabst filed a petition for *certiorari* in this Court, seeking review of the following question: "When control of a beer brand changes hands through a sale of the stock of a beer manufacturer, is there a 'successor beer manufacturer' with the right to terminate a distribution agreement?" On May 11, 2021, we granted Pabst's petition. *Pabst Brewing Co. v. Frederick P. Winner, Ltd.*, 474 Md. 631 (2021).

## II

## Discussion

There are no material disputes of fact at this stage of the case. Rather, resolution of this appeal depends entirely on the proper interpretation of the SML, a question of law that we review *de novo*. *Uthus v. Valley Mill Camp, Inc.*, 472 Md. 378, 385 (2021).

The goal of statutory interpretation is to "ascertain and effectuate the actual intent of the General Assembly in enacting the law under consideration." *Matter of Collins*, 468 Md. 672, 689 (2020). In conducting this inquiry, "we begin with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (internal quotation marks and citations omitted). If the statutory language is "unambiguous and clearly consistent with the statute's apparent purpose, [the] inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction." *Lockshin v. Semsker*, 412 Md. 257, 275 (2010). We "neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application." *Id.* (internal quotation marks and citations omitted). Rather, we construe the

12

statute "as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park*, 392 Md. 301, 316 (2006).

We do not "read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone." *Lockshin*, 412 Md. at 275. "Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 276. We presume "that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.* To the extent there is ambiguity in statutory language, we strive to resolve it by "searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Id.* We also often review legislative history to determine whether it confirms the interpretation suggested by our analysis of the statutory language. *See, e.g., In re O.P.*, 470 Md. 225, 255 (2020). Further, we "check our interpretation against the consequences of alternative readings of the text," *Bell v. Chance*, 460 Md. 28, 53 (2018), which "grounds the analysis." *In re O.P.*, 470 Md. at 255. Doing so helps us "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense," *Mayor & Town Council of Oakland*, 392 Md. at 316; *see also Bell*, 460 Md. at 53 (explaining that, throughout the statutory interpretation process, "we avoid constructions that are illogical or nonsensical, or that render a statute meaningless").

13

A. **Interpretation of the SML**

1. The Statutory Language

The SML provides that a "'[s]uccessor beer manufacturer' includes a person or license holder who replaces a beer manufacturer with the right to sell, distribute, or import a brand of beer." AB § 5-201(a)(5). Winner argues that the plain language of the SML requires the replacement of an existing beer manufacturer by another as the holder of the State-issued license or permit that allows the beer manufacturer to sell, distribute, or import a brand of beer in Maryland. Pabst disagrees, contending that the SML plainly encompasses the situation where a change of corporate control of a beer manufacturer occurs, but where no entity replaces the beer manufacturer as the holder of a State-issued license or permit with respect to a beer brand. We agree with Winner.

The key phrases in § 5-201(a)(5) are "replaces a beer manufacturer" and "with the right to sell, distribute, or import a brand of beer." The verb "replace" means "to take the place of especially as a substitute or successor[,]" or "to put something new in the place of." *Replace*, MERRIAM-WEBSTER DICTIONARY, available at https://perma.cc/FB7A-9D7L. Thus, the plain language of § 5-201(a)(5) contemplates that a "successor beer manufacturer" takes the place of an existing "beer manufacturer." This is confirmed by § 5-201(b), which provides that, "[e]xcept for the discontinuance of a brand of beer or for good cause shown as provided under § 5-108 of this title, a successor beer manufacturer that *continues in the business* is obligated under all the terms and conditions of the agreement made between the *previous* beer manufacturer and the existing beer wholesaler that were in effect on the date of *change* of beer manufacturers." (Emphasis added.) This

14

language reflects the General Assembly's intent to condition application of the SML on a "change" of beer manufacturers, whereby the "previous" beer manufacturer does not "continue[] in the business" of selling, distributing, or importing the brand of beer in Maryland, and its place in that "business" is taken (*i.e.*, it is replaced in that business) by another beer manufacturer.

Viewed in this context, it is plain that the phrase "with the right to sell, distribute, or import a brand of beer" in § 5-201(a)(5) refers to the right conferred by a State-issued license or permit to sell, distribute, or import the brand of beer in Maryland. It is that license or permit that has allowed the "previous" beer manufacturer legally to be "in the business" of selling, distributing, or importing the beer brand in Maryland. To put a finer point on it, the license or permit has allowed the previous beer manufacturer legally to enter into a beer franchise agreement with a Maryland wholesaler under which the wholesaler distributes the beer manufacturer's brand(s) of beer.

Pabst makes several arguments in support of an alternative interpretation of the meaning of a "successor beer manufacturer" that turns on a person's or entity's control of a license or permit holder. First, Pabst focuses on the phrase "person or license holder"[3] in

---

[3] As relevant here, a "person" is defined in the Alcoholic Beverages Article as "an individual" or "an association, a partnership, a corporation, a trust, or any other entity, and the officers, directors, and other individuals in active control of the activities of the association, partnership, corporation, trust, or other entity." AB § 1-101(y)(1) & (2) (Supp. 2021). A "license holder" is defined as "the holder of a license issued or a permit granted under this article." *Id.* § 1-101(q)(1). Prior to the recodification of the Alcoholic Beverages Article in 2016, Article 2B, § 1-102(a)(15)(i) (1957, 2011 Repl. Vol.) provided: "'License holder' or 'licensee' means the holder of any license or permit, issued under the provisions of this article or any other law of this State…." As part of the recodification, the definition was changed to delete "licensee." A revisor's note explained that "the former alternative

15

§ 5-201(a)(5), arguing that because a "person" – in addition to a "license holder" – may be a successor beer manufacturer, a "person" need not hold a license or permit post-acquisition to qualify as a successor beer manufacturer. Pabst reasons that a contrary interpretation reads "person" out of § 5-201(a)(5).

We disagree with Pabst's construction of "person or license holder." First, it is Pabst that seeks to read a word out of the definition of a successor beer manufacturer, namely, the word "replaces." In Pabst's view, if a license or permit holder's corporate parent changes as a result of a corporate transaction, it does not matter that the entity that held the license or permit prior to the corporate acquisition continues to do so after the acquisition. But § 5-201(a)(5) requires the "beer manufacturer" that had the right to sell, distribute, or import the beer brand to be "replace[d]" by the successor beer manufacturer. By failing to give effect to the word "replaces" in § 5-201(a)(5), Pabst renders that word "meaningless, surplusage, superfluous, or nugatory." *See Mayor & Town Council of Oakland*, 392 Md. at 316.

In contrast to Pabst's treatment of "replaces," our interpretation of § 5-201(a)(5) does not read "person" out of that subsection. Pabst construes "person or license holder," as used in § 5-201(a)(5), as referring to such entities as they exist *after* a corporate acquisition. In our view, "person or license holder" refers to the successor *before* its replacement of a license holder. That is, "person or license holder" makes clear that the new holder of the right to sell, distribute, or import a beer brand may or may not be an

defined term 'licensee' is deleted to avoid any confusion that might result from using two different defined terms with the same meaning." 2016 Md. Laws 675.

16

existing license or permit holder prior to becoming the license or permit holder with respect to the brand in question. This construction of "person or license holder" gives effect to that phrase as well as to the language that follows it ("replaces" a beer manufacturer "with the right" to sell, distribute, or import the beer brand).[4]

Second, we disagree with the unstated but necessary rationale underlying Pabst's reading of "person or license holder" – that more than one person possesses the "right to sell, distribute, or import a brand of beer" for purposes of the SML after a corporate acquisition of an entity that holds a license or permit: (1) the acquired license or permit holder; and (2) any "person" that has acquired control of the operations of the license or permit holder. Nothing in the language of the SML suggests that the General Assembly contemplated that, for purposes of triggering application of the statute, the "right to sell, distribute, or import" the same brand of beer might belong to two different persons following a corporate transaction. To the contrary, the language of the SML reflects that the General Assembly intended that, for purposes of the SML, there would be one person that would have the "right" at any given time "to sell, distribute, or import a brand of beer": first, the beer manufacturer that has been "in the business" of selling, distributing, or importing the brand under the terms of an agreement with a beer wholesaler; and second, the beer manufacturer that "continues in the business" of selling, distributing, or importing the brand and is therefore "obligated under all the terms and conditions of the agreement

---

[4] As noted below, the legislative history of the 1998 amendment to the SML, which added the definition of "successor beer manufacturer" to the statute, supports our interpretation of "person or license holder."

made between the previous beer manufacturer and the existing beer wholesaler that were in effect on the date of *change of beer manufacturers*." AB § 5-201(b) (emphasis added). The second beer manufacturer must "replace" the first beer manufacturer – which had "made" the "agreement"[5] with the existing beer wholesaler – rendering the first beer manufacturer a "previous beer manufacturer" with respect to the brand in question. The SML does not contemplate that the beer manufacturer that made the operative agreement with the existing beer wholesaler will continue in the business alongside the successor beer manufacturer. Rather, the SML contemplates a "change of beer manufacturers."

Next, Pabst argues that the phrase "with the right to sell, distribute, or import a brand of beer," as used in § 5-201(a)(5), does not mean the acquiring entity must replace an entity that possesses a State-issued license or permit. Rather, according to Pabst, "the right to sell, distribute, or import" may also mean the right to control the operations of a subsidiary entity that holds the license or permit to sell, distribute, or import the beer brand in Maryland. In support of this contention, Pabst notes that the statute does not refer to the "replace[ment]" of a "license holder," but rather to the replacement of a "beer manufacturer." Pabst then points to the definition of "beer manufacturer" in § 5-201(a)(3), noting that it is broad enough to encompass entities that do not hold a Maryland license or permit. Relatedly, Pabst observes that, under the BFFDA, a "franchisor" is a "beer

---

[5] Under AB § 5-201(a)(2), an "[a]greement" is "oral or written evidence between a beer manufacturer and a beer wholesaler granting the beer wholesaler the right to offer and sell the brands of beer offered by the beer manufacturer."

18

manufacturer" that enters into a "beer franchise agreement" with a "beer distributor."[6] As the entity that contracts to sell a brand of beer to a wholesaler in Maryland, a franchisor – unlike other "beer manufacturers" – must hold a State-issued license or permit. Pabst contends, therefore, that the General Assembly would have referred to replacement of a "franchisor," rather than replacement of a "beer manufacturer," if it had intended to require that the entity to be "replace[d]" be the holder of the license or permit that allows the manufacturer to sell its beer to a wholesaler.

We are not persuaded. In defining a successor beer manufacturer, the SML nowhere refers to "control" of a beer manufacturer or its operations. To be sure, an entity does not need to hold a Maryland license or permit to be a "beer manufacturer" under § 5-201(a)(3). However, § 5-201(a)(5) does not refer to a "beer manufacturer" in a vacuum. Rather, it conditions application of the SML upon the replacement of a beer manufacturer "with the right to sell, distribute, or import a brand of beer." And, as discussed above, § 5-201(b) makes clear that the replaced "beer manufacturer" is the "previous beer manufacturer" that "made" an "agreement" with a beer wholesaler granting the wholesaler the right to distribute the beer manufacturer's brand(s) of beer. A non-resident dealer's permit issued under AB § 2-124 allows a "bottler, brewer, … [or] manufacturer" that holds such a permit to "sell beer … to license holders authorized to receive the beverages." AB § 2-124(b)(1) & (d). Thus, the SML contemplates that the parties to an agreement between a beer

---

[6] The BFFDA provides that a "franchisor" is a "beer manufacturer that: (1) enters into a beer franchise agreement with a beer distributor; or (2) is a party to a beer franchise agreement." AB § 5-101(g) (Supp. 2021).

19

manufacturer and a beer wholesaler will both hold Maryland licenses or permits. It follows that the entity being "replace[d]" under § 5-201(a)(5) must be a Maryland license or permit holder.

Pabst's distinction between a "beer manufacturer" and a "beer franchisor" also misses the mark. While the BFFDA refers separately to a "beer manufacturer" and a "beer franchisor," the latter being a particular kind of "beer manufacturer," the SML only refers to a "beer manufacturer" and does not mention a "franchisor." As discussed above, § 5-201(b) refers to "the agreement made between the previous beer manufacturer and the existing beer wholesaler that [was] in effect on the date of change of beer manufacturers." Thus, a "previous beer manufacturer," as used in § 5-201(b), must be an entity that would qualify as a "beer franchisor" under the BFFDA and, therefore, is the holder of a license or permit. Given that the "previous beer manufacturer" referred to in § 5-201(b) must be a beer franchisor, it stands to reason that § 5-201(a)(5)'s "beer manufacturer with the right to sell, distribute, or import a brand of beer" must also be a "beer franchisor" within the meaning of the BFFDA.

Finally, Pabst points out that § 5-201(a)(5) uses the word "includes" rather than "means" in defining a successor beer manufacturer. Thus, according to Pabst, § 5-201(a)(5) does not limit a "successor beer manufacturer" to the person or entity that replaces a previous beer manufacturer with the right to sell, distribute, or import the beer brand.

Pabst is correct that we ascribe significance to the General Assembly's choice of "includes" in a statutory definition. Indeed, the General Assembly has defined "[i]ncludes or including" to mean "includes or including by way of illustration and not by way of

20

limitation." Md. Code Ann., Gen. Prov. § 1-110 (Supp. 2021). However, Pabst has not provided us with any basis to conclude that the General Assembly intended a corporate entity that purchases a controlling interest in a Maryland-licensed beer manufacturer – and the individual(s) who control the acquiring corporate entity – to qualify as successor beer manufacturers, without expressly saying so.[7]

To summarize, Winner is correct that the SML's plain language requires a successor beer manufacturer to replace the previous beer manufacturer as the holder of a license or permit that allows a beer manufacturer legally to sell, distribute, or import a beer brand in Maryland.

2. Legislative History

The legislative history of the SML confirms Winner's interpretation of the statutory language. The General Assembly enacted the original version of the SML in 1990. 1990 Md. Laws, ch. 281. Codified as Article 2B, § 220 of the Maryland Code, the SML originally provided in its entirety:

§ 220. Beer manufacturer and distribution agreements; obligation of successor manufacturer.

(a) *Definitions.* – (1) In this section, the following words have the meanings indicated.

(2) "Agreement" means oral or written evidence between a beer manufacturer and beer distributor where the distributor is granted the right to offer and sell the brands of beer offered by the beer manufacturer.

---

[7] To the contrary, as discussed below, the legislative history of § 5-201(a)(5) indicates that the General Assembly did not have the concerns expressed by Pabst in mind when it added the definition of "successor beer manufacturer" to the SML. In addition, Pabst's interpretation likely would lead to additional litigation and would be inconsistent with settled principles of corporate law, further undermining Pabst's position.

(3) "Beer manufacturer" means every brewer, fermenter, processor, bottler or packager of beer located within or without the State of Maryland, or any other person whether located within or without the State of Maryland who enters into an "agreement" with any beer distributor doing business in the State of Maryland.

(4) "Gross profit" means:

(i) The beer distributor[']s selling price of the subject brand of beer; less
(ii) The FOB cost and the transportation cost of the brand to the beer distributor.

(b) *Obligation of successor manufacturer.* – Except for the discontinuance of a brand of beer or for good cause shown as provided under § 203C of this article, a successor beer manufacturer that continues in the business is obligated under the agreement that was made between the previous beer manufacturer and the surviving beer distributor under all the terms and conditions of that agreement that were in effect on the date of change of beer manufacturers.

(c) *Violation of agreement provisions.* – A successor beer manufacturer who violates any of the agreement provisions required to be continued under subsection (b) of this section shall remunerate the beer distributor a sum equal to the gross profit for the sale of the subject brand or brands of beer for 2 years prior calculated from the date of violation.

Md. Code Ann., Art. 2B, § 220 (1957, 1990 Repl. Vol.).[8]

The bill analysis for Senate Bill 700, which became the SML, stated that the bill "requires a beer manufacturer who acquires the business from a previous manufacturer to fulfill all the provisions of any distribution agreement entered into by the previous manufacturer and a distributor that were in effect as of the date of the transfer of ownership." Bill Analysis, Sen. Bill 700 (1990). The analysis explained that "[w]ithin the

---

[8] In 1994, the General Assembly recodified the SML as § 21-103 of Article 2B without making any substantive changes. *See* Md. Code Ann., Art. 2B, § 21-103 (1957, 1994 Repl. Vol.).

industry, consolidations and mergers are becoming increasingly common. The surviving company is then making significant changes in longstanding arrangements within and among the 3-tier system of manufacturer, distributor, and wholesale and retail sales…. This bill is intended to preserve and strengthen the 3-tier system." *Id.* The floor report for the bill further explained that the bill was intended to "provide economic relief to a distributor who sustains an economic loss from a change in the corporate structure of a manufacturer." Floor Report, Sen. Bill 700 (1990).

The SML did not originally define a "successor beer manufacturer." That changed with the 1998 amendment to the SML, which added subsection (a)(5): "'Successor beer manufacturer' includes a person or licensee who replaces a beer manufacturer with the right to sell, distribute, or import a brand of beer." 1998 Md. Laws, ch. 770. This amendment was cross-filed as House Bill 522 and Senate Bill 471.[9] The title to the bill indicated that it was "for the purpose of clarifying the identity of a successor beer manufacturer for purposes of certain agreements involving beer manufacturers who leave the business, successor beer manufacturers, and surviving beer distributors." The bill files for both bills include a letter to Delegate Michael R. Gordon, dated March 5, 1998, from then-Assistant Attorney General Robert A. Zarnoch, Counsel to the General Assembly.[10] AAG Zarnoch wrote:

---

[9] Both House Bill 522 and Senate Bill 471 were signed by the Governor. Senate Bill 471 was signed later and therefore superseded House Bill 522. *See Wheeling v. Selene Finance LP*, 473 Md. 356, 405 n.2 (2021) (Getty, J., concurring and dissenting).

[10] A handwritten note elsewhere in the bill file for House Bill 522 states that the text of the amendment "was drafted by Bob Zarnoch to clarify what he believes the law already

You have requested advice on the intent of HB 522 / SB 471 … which would amend Article 2B, §21-103, regarding beer manufacturers and distributor agreements and the obligation of successor manufacturers, to define the term, "successor beer manufacturer" to include "a person or licensee who replaces a beer manufacturer with the right to sell, distribute, or import a brand of beer." The title to the bill indicates that this is a "clarifying" change to the law and, in my view, this is an appropriate characterization of the intent of the measure.

… The 1990 legislation broadly and specifically defined "beer manufacturer" to include "any … person whether located within or without the State of Maryland" who enters into an agreement with a beer distributor to sell the brands of beer offered by the beer manufacturer. However, this statute contained no definition of "successor".

Last fall the issue arose of whether a change in beer importers without an acquisition of an ownership interest by the new importer triggered the protections of the Act. On one hand, the term "beer manufacturer" under the statute was broad enough to include an importer. *See Gulfside Distributors, Inc. v. Becco Ltd.*, 985 F.2d 513, 515 (11th Cir. 1993).[11] Moreover,

---

requires. It involves a 3-way arrangement between the manufacturer, importer, and distributor and attempts to get around the provision that allows termination of distributor agreement only for cause." The bill file does not indicate who wrote this note. In 2008, AAG Zarnoch became a judge of the Court of Special Appeals.

[11] *Gulfside Distributors* involved the importation of Beck's beer and its subsequent distribution in two Florida counties. Driskill, Inc. (whose trade name was Old Dribeck) imported Beck's under a license from the German brewer of the beer, Beck's-Germany. In 1983, Old Dribeck signed a contract with Beck's-Germany, which provided that Beck's-Germany would assume the operations of Old Dribeck, and would acquire certain assets, liabilities, and Old Dribeck's trade name, by September 30, 1990. 985 F.2d at 514. In 1984, Gulfside Distributors, Inc. ("Gulfside"), which was unaware of the 1983 agreement between Beck's-Germany and Old Dribeck, became the distributor of Beck's beer in Pinellas and West Pasco counties under the terms of an agreement with Old Dribeck. *Id.* On December 31, 1988, Beck's-Germany acquired Old Dribeck's operation – but apparently not ownership of Old Dribeck's stock – through Becco, Ltd., a subsidiary of Beck's-Germany. Gulfside subsequently was notified that Old Dribeck no longer possessed the right to import Beck's-brand products, and that the new importer, Becco, would select its own wholesaler to distribute Beck's beer. Gulfside sued Becco in federal court, alleging that Becco had terminated Gulfside's Beck's beer distributorship in violation of Florida's beer distribution statute. The district court granted summary

application of the statute would have been consistent with the remedial purpose of the 1990 legislation. However, the word "successor", which was undefined in the law, usually connotes one who has "legal" succession through the acquisition of assets and continuation of operations as a subsequent owner…. And the legislative history of the 1990 legislation made repeated references to acquisitions, consolidations, mergers and transfers of ownership, not a mere change in importers….

House Bill 522 / Senate Bill 471 would clarify this ambiguity by specially defining "successor" beer manufacturer, just as the old law specially defined a "beer manufacturer", in accordance with the remedial purpose of the original legislation.

In 2008, the General Assembly substantially amended the SML. Among other things, the General Assembly amended subsection (c) of the SML to provide that a "successor beer manufacturer who terminates any of the agreement provisions required to

judgment in favor of Becco, in part, on the ground that Becco was not a "successor manufacturer" within the meaning of the Florida statute. *Id.* That statute provided:

Agreements binding on successor.—A successor to a manufacturer that continues in business as a manufacturer shall be bound by all terms and conditions of each agreement of the manufacturer in effect on the date of succession.

*Id.* The Eleventh Circuit reversed the portion of the district court's ruling concerning Florida's successor manufacturer provision, and held that Becco was a successor to Old Dribeck under the Florida statute. *Id.* at 514-15. The Court explained:

After Becco assumed Old Dribeck's operations, it acquired Old Dribeck's trade name and continued its business of importing Beck's beer. Most of Old Dribeck's employees remained with Becco, as did most of Old Dribeck's distributors. Furthermore, Becco adopted Old Dribeck's compensation structure, schedule of benefits, operating procedures, and delivery procedures. Becco's management continued to work with the Beck's distributors exactly as Old Dribeck's management had. Neither party argues that a continuity of *ownership* is required for successor status. It is clear that the district court erred in this regard.

*Id.* at 515 (emphasis in original).

25

be continued under subsection (b) … shall remunerate the beer distributor a sum equal to the fair market value for the sale of the subject brand or brands of beer calculated from the date of termination." 2008 Md. Laws, ch. 370. The prior version of the SML set the remuneration for a violation of the agreement at "a sum equal to the total of the gross profit for the sale of the subject brand or brands of beer for 2 years prior calculated from the date of violation." Md. Code Ann., Art. 2B, § 21-103(c) (1957, 2005 Repl. Vol.). In addition, the General Assembly added provisions to the SML regarding: notice of termination; good-faith negotiations to determine fair market value; nonbinding mediation if an agreement is not reached through good-faith negotiations; and, if an agreement is still not reached within 45 days after mediation begins, an action in court to be brought by the "surviving beer distributor" to determine and award fair market value. Md. Code Ann., Art. 2B, § 21-103(d) (1957, 2011 Repl. Vol.).

Writing in support of House Bill 205, which ultimately became the 2008 amendment to the SML,[12] the Maryland Beer Wholesalers Association, Inc. ("MBW") observed that the SML was originally enacted to address "the potential negative financial impact of beer manufacturer consolidations on Maryland's beer distributors." MBW contended that rapidly increasing consolidation among large beer manufacturers necessitated additional legislative action.

---

[12] House Bill 205 was cross-filed with Senate Bill 118. Both bills were eventually signed by the Governor. In this instance, the House Bill was signed after the Senate Bill, so House Bill 205 became the operative bill.

Pabst argues that the legislative history of the SML supports its control-focused interpretation of the law. According to Pabst, the 1990 and 2008 bill file materials reveal that the core purpose of the statute is to address mergers and acquisitions of entire beer companies, which typically occur by way of stock transfers, and not just transactions in which the assets relating to a beer brand change hands.

Although Pabst is correct that industry consolidation prompted the enactment of the SML, the legislative history of the original version of the SML states that the law "requires a beer manufacturer who acquires the business from a *previous* manufacturer to fulfill all the provisions of *any distribution agreement entered into by the previous manufacturer* and a distributor that were in effect as of the date of the transfer of ownership." Bill Analysis, Sen. Bill 700 (1990) (emphasis added); *see also* 1990 Floor Report (referring to a "surviving" company making "significant changes in long-standing arrangements within and among the 3-tier system of manufacturer, distributor, and wholesale and retail sales"). This tends to confirm Winner's interpretation of the plain language of the SML, which focuses on the replacement of one beer manufacturer by another. In Pabst's view, though, the concerns about consolidation that led to the enactment of the SML and its amendment in 2008 are no less present when an entity acquires 100 percent of a beer manufacturer's stock but chooses not to merge it out of existence, instead operating the acquired beer manufacturer as a subsidiary.

Pabst's argument has some intuitive force, but does not account sufficiently for the stated legislative policy of protecting distributors. Under Winner's interpretation, if a person who acquires a beer manufacturer does not replace that beer manufacturer as the

license holder with respect to the brand in question, the acquiring person may terminate the agreement between the existing beer manufacturer and its distributor only for cause. Thus, Winner's reading of the statutory language provides greater protection to distributors than Pabst's. To be sure, the SML was enacted to strike a balance between the interests of acquiring beer manufacturers and pre-existing beer distributors. However, to the extent there is any ambiguity in the SML as to how the General Assembly intended to strike that balance, the overarching legislative goal to protect distributors provides a sound basis to adopt the interpretation of the statute that affords greater protection to distributors.

Pabst's argument is further undercut by AAG Zarnoch's letter setting forth the intent of the 1998 amendment that added the definition of "successor beer manufacturer" to the SML. In his letter, AAG Zarnoch stated that "successor" "usually connotes one who has 'legal' succession through the acquisition of assets and continuation of operations as a subsequent owner." Although AAG Zarnoch indicated that the intent of the amendment was to clarify that the SML applies not only where an acquiring entity acquires a beer manufacturer's assets and continues the operations of the predecessor beer manufacturer, his letter strongly suggests that the clarifying definition was not intended to address a different acquisition form, *i.e.*, a stock purchase of a beer manufacturer where the acquired beer manufacturer would continue as a going concern and would remain the license holder with respect to the beer brand. Rather, the General Assembly added the definition of successor beer manufacturer to the SML to address the replacement of a beer manufacturer/license holder by another beer manufacturer/license holder with no change of ownership of the previous beer manufacturer. In other words, as the title of the bill put

28

it, the General Assembly clarified that the SML applies whenever a licensed beer manufacturer "leaves the business" of selling, distributing, or importing a beer brand and another entity replaces it as the license holder for that business, irrespective of whether the replacement has resulted from a change in ownership of the previous license holder.[13]

Pabst presumably would respond: If the General Assembly intended the SML to apply broadly whenever a beer manufacturer "leaves the business" with respect to a beer brand and is replaced in that business by another, would not the General Assembly also have intended the SML to apply whenever there is a change in control of the existing beer manufacturer but the beer manufacturer remains the permit holder with respect to the brand? The answer, in our view, is that if the General Assembly had intended the SML to apply in that context, it would not have referred to "a person or license holder who *replaces*" an existing beer manufacturer; to the agreement between the "*previous* beer manufacturer" and the existing distributor; or to the "date of *change* of beer

---

[13] As AAG Zarnoch explained, the concern that led to the amendment arose in the context of a change of importers. In that situation, the existing importer would be the permit holder with respect to the beer brand and would have entered into the agreement with a beer wholesaler to distribute the brand in Maryland. AAG Zarnoch explained that the amendment was intended to make clear that, if the foreign manufacturer switched from the existing importer to a different importer that had its own importation permit, the new importer nevertheless would be required to honor the existing importer's contract with the distributor or pay remuneration to the existing distributor. In that situation, the new importer would not have acquired any stock or assets of the existing importer. However, the SML nevertheless would apply, despite the lack of a change of ownership of the existing importer. That would be the case because the new importer replaced the existing importer as the holder of the permit with respect to the beer brand. This scenario supports the construction of "person or license holder" in AB § 5-201(a)(5) as referring to the status of the successor beer manufacturer before the replacement of the existing beer manufacturer.

manufacturers." And, as discussed in the next section, there are good reasons for the General Assembly to have distinguished between the replacement and non-replacement of the license/permit holder for purposes of triggering application of the SML.

3.  The Consequences of Alternative Readings of the SML

Adopting Pabst's interpretation of the SML would lead to confusion and would be inconsistent with settled principles of corporate law. These consequences further convince us that Winner's interpretation of the SML is consistent with legislative intent.

First, the SML provides no clue as to what kind of change in control of a beer manufacturer would trigger application of the SML, and Pabst sheds no light on that point either. Would only a purchase of 100 percent of a beer manufacturer's stock qualify the acquiring entity as a successor beer manufacturer? What if the purchasing entity was an LLC whose members were comprised of the management team that had operated the beer manufacturer for many years? Would two individuals who own equal shares of an acquiring entity both be considered successor beer manufacturers (perhaps in addition to the acquiring entity itself) because they share ultimate management authority over the operations of the subsidiary? What if, a year after the acquisition, one of those two owners purchases one percent of the other owner's shares? Would the new 51 percent owner of the beer manufacturer's parent entity have the power to terminate the beer franchise agreement that the parent entity had caused the subsidiary beer manufacturer to sign with a new wholesaler after the acquisition a year earlier? Would every officer and director of a corporation that obtained a controlling interest in a beer manufacturer be considered a successor beer manufacturer? After all, in the Alcoholic Beverages Article, a "person"

includes "the officers, directors, and other individuals in active control of the activities" of an "association, partnership, corporation, trust, or other entity." AB § 1-101(y)(2) (Supp. 2021).

These questions raise the concern that, if adopted, Pabst's control-based interpretation of the SML would lead to more litigation, with parties contesting whether there was a sufficient change in control over the operations of a beer manufacturer to trigger the SML. In contrast to Pabst's interpretation of the SML, Winner's construction is straightforward. In order for there to be a successor beer manufacturer, the "previous beer manufacturer" must leave the business, and the would-be successor must replace the departing beer manufacturer as the holder of a license or permit that allows the beer manufacturer legally to be in the business of selling, distributing, or importing a beer brand in Maryland.

Second, Pabst's interpretation runs contrary to settled principles of corporate law. "A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). Thus, "[a]n individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets and, as a result, does not own subsidiary corporations in which the corporation holds an interest." *Id.* at 475. Similarly, "[a] corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary." *Id.*; *see also* 1 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS, § 26 (2015 rev. ed.) ("A

31

subsidiary corporation is presumed to be a separate and distinct entity from its parent corporation. This rule applies even where one corporation wholly owns another and even though the entities have identical officers and directors.") (footnotes omitted).

Under these well-established principles, the corporate parent of a beer manufacturer does not have an interest in, or any obligations under, a beer franchise agreement between the subsidiary beer manufacturer and a beer distributor. It follows that, when another entity acquires the stock of the corporate parent, in the absence of an assignment of the beer manufacturer's rights under the beer franchise agreement to the acquiring entity or to another subsidiary of the acquiring entity, the existing beer manufacturer retains its interest in, and obligations under, the beer franchise agreement.

Pabst acknowledges these principles of corporate law, but contends that they are irrelevant in assessing the General Assembly's intent in enacting the SML. As Pabst observes, "[a] parent corporation is generally justified in requiring its subsidiary to modify economic arrangements, contractual or otherwise, if those arrangements do not benefit the parent." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 658 (1994). That being the case, Pabst contends, the General Assembly intended the SML to apply to a bona fide change of control over a beer brand. In Pabst's view, Winner's construction exalts the form of a transaction over its substance – something, Pabst believes, the General Assembly would not do. In addition, Pabst argues that Winner's interpretation effectively would make the SML elective, and would result in gamesmanship by existing beer manufacturers. That is, under Winner's interpretation (as Pabst characterizes it), if the parent of a beer manufacturer wanted to terminate a distributor but lacked cause to do so,

32

the parent simply could (a) create a new subsidiary that obtains a state license or permit, (b) direct the existing subsidiary beer manufacturer to transfer the beer brand assets to the new subsidiary, and (c) then claim that the SML authorizes termination of an existing distribution agreement, all without a bona fide change of control over the management of the beer manufacturing business.

The problem with Pabst's argument is that, in the context of corporate acquisitions, form matters. As one commentator explains:

> Perhaps few other corporate transactions provide the participants with such different options to achieve the same basic result, and, accordingly, place such a premium upon form, as does the acquisition of one business conducted through a corporation by another corporation. Specifically, there are three basic approaches the participants can take to structure such a transaction: The participants can undertake a statutory merger or consolidation in which the two corporations involved become one. Alternately, the participants can have one corporation sell all or substantially all of its assets to the other corporation. Finally, one corporation can purchase most or all of the outstanding stock in the other corporation from the other corporation's shareholders. Moreover, there are numerous variations on each of these three basic approaches.
>
> The existence of these different avenues to reach more or less the same end result would be only of technical interest were it not for one other fact: The route chosen can lead to significantly different results under a variety of laws.

FRANKLIN A. GEVURTZ, CORPORATION LAW § 7.2 (2d ed. 2010); *see also* 1 VICTOR I. LEWKOW, MANUAL OF FOREIGN INVESTMENT IN THE U.S. § 6:47 (3d ed. 2013) ("Often the form in which the desired assets are held will influence which form of acquisition, stock, or asset, is used…. Each form of acquisition presents specific advantages and disadvantages to the buyer and seller, with tax and liability-related issues frequently

controlling which form is chosen."). Notably, Mr. Kashper structured the new ownership of Pabst as he did "[f]or legal and tax purposes."

The General Assembly surely is aware that corporations and their owners frequently decide to employ a particular form of corporate acquisition "for legal and tax purposes," and that the form they choose "can lead to significantly different results under a variety of laws." Thus, it is reasonable to conclude that, if the General Assembly wanted to afford acquiring entities maximum flexibility in choosing how to obtain control of a beer brand without forgoing applicability of the SML, the General Assembly would have written the SML differently.

Pabst reinforces our view on this point by directing our attention to the successor manufacturer laws of several other states, including Ohio. As Pabst observes, the United States Court of Appeals for the Sixth Circuit has interpreted Ohio's law using a control-based approach. *See Tri Cty. Wholesale Distribs., Inc. v. Labatt USA Operating Co.*, 828 F.3d 421, 424-29 (6th Cir. 2016). However, we agree with the Court of Special Appeals' discussion of the Ohio statute and the Sixth Circuit decision:

> Critically, … the language of the statute at issue in *Tri County* was far broader than the statute at issue in this appeal. The relevant Ohio statute at issue in *Tri County* provided that a "successor manufacturer" may terminate a distributor when "a successor manufacturer **acquires all or substantially all of the stock or assets** of another manufacturer through merger or acquisition." *Id.* at 429 (quoting Ohio Rev. Code § 1333.85(d)) (emphasis supplied). This is a much broader definition than the definition of successor beer manufacturer under Maryland law, which recognized a successor as one who "replaces a beer manufacturer with the right to sell, distribute, or import a brand of beer." AB § 5-201(a)(5). Indeed, if the General Assembly had intended the determination of whether an entity is a successor beer manufacturer to be focused upon the control of the company and/or the acquisition of stock or assets, the legislature could have included such

34

language in the statute. Instead, the General Assembly focused upon whether a beer manufacturer was "replaced" with an entity that has "the right to sell, distribute, or import a brand of beer." This is the clear and unambiguous language that we must apply to the undisputed facts presented in this case.

*Winner II*, 245 Md. App. at 251-52 (emphasis supplied by the Court) (footnote omitted).[14]

[14] The other states' statutes that Pabst cites also use substantially different language in defining successor manufacturers and their obligations than the General Assembly included in the SML. None of those other states' laws refers to "a person or license holder who replaces" an existing beer manufacturer; to the agreement between the "previous beer manufacturer" and the existing distributor; or to the "date of change of beer manufacturers." Nevertheless, it is far from clear that all of those other states' statutes would apply in the situation where a beer manufacturer, after being acquired by another beer manufacturer, remains the license holder that is legally permitted to sell the beer brand to a wholesaler. *See* 815 ILCS 720/1.1(6) (under Illinois statute, "'[s]uccessor [b]rewer' means any person who in any way obtains the distribution rights that a brewer, non-resident dealer, foreign importer, or master distributor *once had* to manufacture or distribute a brand or brands of beer whether by merger, purchase of corporate shares, purchase of assets, or any other arrangement, including but not limited to any arrangements transferring the ownership or control of the trademark, brand or name of the brand") (emphasis added); Iowa Code § 123A.2(15) ("'Successor brewer' means a person *who succeeds to the role of a brewer* or master distributor to manufacture or distribute one or more brands of beer whether by merger, purchase of corporate shares, purchase of assets, or any other arrangement.") (emphasis added). Washington's law regulating the relationship between manufacturers and distributors of spirits or malt beverages allows a "supplier" to terminate an agreement with a distributor without cause where the "supplier acquir[es] the right to manufacture or distribute a particular brand and elect[s] to have that brand handled by a different distributor." Wash. Rev. Code § 19.126.040(2). Notably, a "supplier" is defined as "any spirits or malt beverage manufacturer or importer who enters into or is a party to any agreement of distributorship with a wholesale distributor." *Id.* § 19.126.020(10). Such an entity must possess a license or a "certificate of approval" under Washington law. *Id.* § 66.24.270. Thus, as we understand Washington's statutory scheme, it resembles the SML in that the entity that is authorized to terminate a distributor without cause is a license holder. It also should be noted that not every state that obligates successor beer manufacturers to honor a predecessor manufacturer's contract with a distributor provides an option to terminate the contract without cause. *See* Va. Code Ann. § 4.1-504. This is all to say that we understand the General Assembly to have taken a position that lies between those adopted by other states with respect to the protection afforded to beer distributors. Of course, if we have misinterpreted the General Assembly's intent, it may amend the SML accordingly.

Pabst makes a fair point about the potential for gamesmanship. However, we note that, under AB § 2-106, "[t]he Comptroller may restrict, suspend, or revoke a permit," including a non-resident dealer's permit such as the one that Pabst holds. If the corporate parent of a beer manufacturer obtains, or causes a subsidiary to obtain, a permit to further a scheme to trigger application of the SML without any bona fide change of control with respect to a beer brand, the affected distributor presumably will alert the appropriate State officials and urge revocation of the permit. This prospect may well deter an effort to obtain successor beer manufacturer status through a non-arm's length transaction. If the General Assembly believes that the SML should be amended to require (or to clarify that the SML already requires) that the replacement of a beer manufacturer be the result of a bona fide change of control with respect to the beer brand, the General Assembly of course may do so.[15]

For all of the above reasons, we agree with Winner that, in order to qualify as a successor beer manufacturer with respect to a beer brand, the would-be successor must replace the previous beer manufacturer as the license holder with respect to the brand.

## B. Application of Our Interpretation of the SML to This Case

The application of our interpretation of the SML to this case is straightforward. Mr. Kashper – the majority owner of Blue Ribbon – caused Blue Ribbon to purchase 100

---

[15] We need not decide whether the SML, as currently drafted, contains such a requirement. We also have no occasion in this case to consider whether there is any limitation on the amount of time a successor beer manufacturer may wait post-replacement before providing "notice of termination to the beer wholesaler to be replaced." AB § 5-201(d)(1).

percent of Pabst Holdings, which in turn owns the membership interests in Pabst. Thus, it is fair to say that Mr. Kashper, as of November 13, 2014, became the majority controlling person with respect to the Pabst beer brands. However, Mr. Kashper does not personally own Pabst's assets, nor does he personally hold any right to sell, distribute, or import any of the Pabst beer brands in Maryland. *See Bird v. Wilmington Soc. of Fine Arts,* 43 A.2d 476, 483 (Del. Ch. 1945) ("The owner of the shares of stock in a company is not the owner of the corporation's property.") (citation omitted).[16] The same is true for Blue Ribbon. Both before and after the sale of Pabst Holdings from PCH to Blue Ribbon, Pabst was a distinct legal entity, separate from its shareholders. *See, e.g.*, *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1109 (Del. Ch. 2008) ("[A] corporation has a continuity of existence regardless of its component members. Even though every stockholder of a corporation may change, the corporation maintains its own identity in perpetuity because it is a separate and distinct legal entity from its shareholders."); *Skouras v. Admiralty Enterprises, Inc.,* 386 A.2d 674, 681 (Del. Ch. 1978) ("[M]ere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity."). Tellingly, following the change in ownership at the level

---

[16] Under the internal affairs doctrine, "the laws of the state of incorporation generally will govern matters involving the internal workings of a corporation except where, considering a set of common law factors annunciated in the Restatement (Second) of Conflicts of Laws, a different state has the most significant relationship with the controversy." *Storetrax.com, Inc. v. Gurland*, 397 Md. 37, 52 (2007). Pabst was first a Delaware corporation and is now a Delaware limited liability company, so we look to Delaware law to assess the relationship among Pabst and its parent entities.

of Pabst's grandparent, Pabst informed the Comptroller that it was operating as the same company, and exercising the same rights as it had before the change in ownership.

It is undisputed that, both before and after Mr. Kashper obtained control over the Pabst beer brands, Pabst held Maryland Nonresident Dealer Permit ND-18627, which allowed Pabst to "sell beer … to license holders authorized to receive the beverages." Blue Ribbon replaced PCH as the corporate grandparent of Pabst, but PCH never had the right to sell, distribute, or import the Pabst brands in Maryland. Neither Mr. Kashper nor Blue Ribbon *replaced Pabst* as the beer manufacturer with the right to sell, distribute, or import the Pabst brands in Maryland. It follows that neither Mr. Kashper nor Blue Ribbon qualifies as a successor beer manufacturer under the SML. Although, as part of the acquisition of the Pabst brands, Mr. Kashper could have merged Pabst out of existence and/or could have caused Pabst to transfer the beer brand assets to another entity within the corporate family, he chose not to do so for "legal and tax purposes." That decision had consequences under Maryland law.

Because they were not "successor beer manufacturers," Mr. Kashper and Blue Ribbon lacked the right to terminate Pabst's agreement under the SML. As such, the BFFDA prohibited Pabst from terminating its agreement with Winner without good cause. AB § 5-108(b). The circuit court granted summary judgment to Pabst based on the incorrect premise that Blue Ribbon "replaced the Old Pabst Brewing Company" and, therefore, qualified as a successor beer manufacturer under the SML. Accordingly, the Court of Special Appeals correctly reversed the circuit court's judgment and remanded the case to

38

the circuit court for further proceedings consistent with its opinion. We agree with the Court of Special Appeals' disposition of this case.

## III

## Conclusion

The plain language of the SML provides that a person or license holder is a successor beer manufacturer if it replaces a beer manufacturer with the right to sell, distribute, or import a brand of beer. That only occurs where the person or license holder replaces the beer manufacturer as the license holder with respect to the brand. No person or license holder replaced Pabst as the holder of the permit that allowed the sale of the Pabst brands to Maryland wholesalers. Accordingly, the circuit court erred in granting summary judgment to Pabst.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**